SECURITIES AND EXCHANGE COM-
MISSION, and Securities Investor Protection Corporation, Plaintiffs,

v.

KENNETH BOVE & CO., INC.,
Defendant.

No. 72 Civ. 2287 (MP).

United States District Court,
S. D. New York.

July 10, 1974.

See also, D.C., 353 F.Supp. 496.

Bloomberg & Steinberg, New York City by Joseph Steinberg, New York City, for claimants.

Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City by Ambrose Doskow, and Melvin H. Orlans, New York City, for trustee.

Theodore H. Focht, Washington, D. C. by Martin Condon, Washington, D. C., for Securities Investor Protection Corp.

POLLACK, District Judge.

The Trustee in this SIPC ("Securities Investor Protection Corporation") liquidation being conducted pursuant to the Securities Investor Protection Act of 1970 (the "Act"), 15 U.S.C. §§ 78aaa *et seq.*, has moved for an order determining that the claim filed herein by Joseph and Irma Steinberg (the "claimants") is not that of a "customer" entitled to protection under the Act nor is it an "open contractual commitment" with the Debtor entitled to completion by the Trustee under the Act. The Debtor, Kenneth Bove & Co., Inc., was placed in liquidation under the Act on May 25, 1972.

The claimants were parties to a single transaction with the Debtor; viz., an agreement made on May 4, 1972 to sell to the Debtor 7,800 shares of Princeton Associates for Human Resources ("PAHR") common stock for $23,302.50 net. Delivery and settlement were to be made on May 11, 1972. However, the shares were not delivered to or actually "received in" by the Debtor even by May 25, the date on which the Debtor was taken over for liquidation under the Act.

The claimants allege that it was initially arranged that they would "personally deliver" the shares to the Debtor, but that they were later instructed (al-

legedly) by the Debtor to deliver the shares to Merrill, Lynch, Pierce, Fenner & Smith, another brokerage house. SIPC and its Trustee have no knowledge of any such instructions or their object and there is no recorded information in the Debtor's records to substantiate the claimants' assertion.

It is undisputed that the claimants were not customers of the Debtor prior to the instant transaction and that the 7,800 shares of PAHR were not delivered to the Debtor at any time.

The claimants contend (upon their version of the facts) that they are "customers" within the meaning of the Act entitled to a protected "net equity" claim, or, alternatively, that they had an "open contractual commitment" that should now be completed by the Trustee under the mandate of Section 6(d) of the Act.

Since the Court finds that the claimants did not entrust their stock to the Debtor and thus did not become "customers" as defined in the Act nor do they possess an "open contractual commitment" contemplated by the Act, which a trustee is obligated to complete, the motion of the Trustee to exclude their claim from the protection afforded by the Act to "customers", must be granted.

Section 6(c)(2)(A)(ii) of the Act defines the term "customers" as follows:

" '[c]ustomers' of a debtor means persons (including persons with whom the debtor deals as principal or agent) who have claims on account of securities received, acquired, or held by the debtor from or for the account of such persons (I) for safekeeping, or (II) with a view to sale, or (III) to cover consummated sales, or (IV) pursuant to purchases, or (V) as collateral security, or (VI) by way of loans of securities by such persons to the debtor, and shall include persons who have claims against the debtor arising out of sales or conversions of such securities, and shall include any person who has deposited cash with the debtor for the purpose of purchasing securities, but shall not include any person to the extent that such person has a claim for property which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor or is subordinated to the claims of creditors of the debtor; . . . ."

■■ To have a protected "net equity" claim under the Act as a "customer", the claimant must have *entrusted* his securities to the debtor in liquidation. Claimants' shares were never actually received by the debtor; the Debtor never came into their possession or control so as to become accountable under the Act to the claimants therefor. In order for claimants to fall within the class of "customers" of a Debtor entitled to benefits under the Act, it is necessary that the claim be "on account of securities received, acquired, or held by the debtor."

■ The circumscribed class of customers protected under the Act, those persons who have "entrusted" property to the Debtor, was intentionally chosen by Congress to afford relief akin to the preference given to a reclamation claim which was well understood in bankruptcy proceedings. This type of claim was grounded on possession of identifiable securities by the broker.

In 1938 there was added to the Bankruptcy Act a new subsection (e) to § 60, 11 U.S.C. § 96(e)(1), dealing with stockbroker bankruptcies. This was supposed to clarify and codify the law as theretofore administered although it actually considerably changed it. 5A Remington on Bankruptcy § 2514 (Fifth edition). The general effect of reclamation rights in such bankruptcies was to permit customers to trace and reclaim identifiable property and funds in the stockbroker's possession.

The 1938 amendment of the Bankruptcy Act set forth definitions of reclaimable "property"; this included cash and securities and also a definition of the "customers" entitled to seek reclamation

of property. The defined customers are "persons who have claims on account of securities received, acquired, or held by the stockbroker." Sec. 60(e)(1), 11 U. S.C. 96(e)(1). Undoubtedly, in framing the SIPA, Congress had in mind a similar concept of a protected customer, i. e., one who had entrusted his securities to the debtor and who was claiming against the debtor "on account of securities received, acquired, or held by the debtor". The definition in the Bankruptcy Act and SIPA sections is in identical language. Under each law, the preferential protection is accorded to a person who can trace and identify the trust property or funds in the hands of the stockbroker; other claimants must look to the general assets of the stockbroker for satisfaction.

The statements of Homer H. Budge, a former chairman of the Securities and Exchange Commission, during the legislative hearings preceding the enactment of the Act evidence this intent. *See* Hearings on Federal Broker-Dealer Insurance before the Subcommittee on Securities, Committee on Banking and Currency, U.S. Senate, 91st Cong.2d Sess. at 8 (1970). Accordingly, the absence of actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation has been held to be dispositive against a claim to participation in the coverage under the Act extended by SIPC. *See* SEC v. S. J. Salmon & Co., Inc., Civil No. 72–560 (S.D.N.Y. June 13, 1973) (claim of Galaxy Fund, Inc.); SEC v. Horizon Securities, Inc., Civil No. 72–5112 (S.D.N.Y. May 31, 1974) (claim of Charon Styx Associates). The Court of Appeals in SEC v. F. O. Baroff Co., Inc., 497 F.2d 280 (2d Cir. 1974) has recently recognized in passing, that the term "customer" in the Act is to be read as embracing only one "who has entrusted securities to a broker for some purpose connected with participation in the securities markets." 497 F.2d at 283.

█ The claimants urge that the property here involved was entrusted to another broker-dealer at the express instruction of the Debtor and that therefore there was "constructive delivery" to the Debtor. Whether or not any such instructions were given, it is clear that compliance with such instructions would not result in receipt, acquisition or holding of the securities by the Debtor in the evident sense required by the Act— that is, an actual possession—so as to ground a protected "net equity". In consequence, the claimants may look only to the assets of the general estate for any recovery warranted by proof. In the *Horizon Securities* case, *supra,* it was appositely stated:

> Those having claims for a breach of contract, as is the case here, may participate in the debtor's general estate, but they do not otherwise come within the protection afforded by the Act.

A debtor's refusal to accept a trust proffered, even if fraudulent, is not to be equated with "entrusting" the securities with the debtor which is the condition for coverage under the Act. Whatever may be the merit of a "constructive delivery" argument in other litigated contexts, it does not meet the *sine qua non* of the protection of the Act, namely, the possible loss of securities actually entrusted to a debtor forced into liquidation.

As an alternative, the claimants argue that they are entitled to have their purported open contractual commitment with the Debtor completed by the Trustee. Although they do not suggest any manner of completion, they do urge a result based on the erroneously assumed applicability of Section 6(d) of the Act. That Section provides as follows:

"(d) Completion of Open Contractual Commitments.—The trustee shall complete those contractual commitments of the debtor relating to transactions in securities which were made in the ordinary course of debtor's business and which were outstanding on the filing date—

(1) in which a customer had an interest, except those commitments

the completion of which the Commission shall have determined by rule or regulation not to be in the public interest, or

(2) in which a customer did not have an interest, to the extent that the Commission shall by rule or regulation have determined the completion of such commitments to be in the public interest.

For purposes of this subsection (but not for any other purposes of this Act) (i) the term 'customer' means any person other than a broker or dealer, and (ii) a customer shall be deemed to have had an interest in a transaction if a broker participating in the transaction was acting as agent for a customer, or if a dealer participating in the transaction held a customer's order which was to be executed as a part of the transaction."

■■ The term "open contract" is a term of art in the brokerage business; it is understood in the brokerage community as referring to open "street" obligations. The terms in the statute must be read with an understanding awareness of the language and context of the brokerage business, for the Act is, above all, a statute relating solely to that particular industry. Section 6(d) was clearly intended to apply only to open contractual commitments that exist between a broker or dealer debtor and another broker or dealer. *See* SEC v. Aberdeen Securities Co., Inc., 480 F.2d 1121 (3d Cir.), cert. den. sub nom., Seligsohn v. SEC, 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973); SEC v. Horizon Securities, *supra*; SEC v. Security Planners Ltd., 71 Civ. 656–M (D.Mass. June 23, 1972). *See also* 3 Collier on Bankruptcy ¶ 60.91(3).

■■ The purpose of the limitation in the statute of cognizable contracts to inter-broker (dealer) contracts was to secure the completion of street obligations and not open transactions of a broker with members of the public. The latter may be asserted only against the general aspects of a dealer or brokerage firm. To expand the concept to include contracts by brokers-dealers with members of the public would do violence to the statutory purposes plainly intended in referring to "open contracts".

The claim is accordingly disallowed. So ordered.