SECURITIES INVESTOR PROTECTION CORPORATION, Applicant,

Securities and Exchange Commission, Plaintiff,

v.

ASSOCIATED UNDERWRITERS, INC., Defendant.

No. C 276–73.

United States District Court, D. Utah, C. D.

May 7, 1975.

Theodore H. Focht and Wilfred R. Caron, Washington, D. C., for SIPC.

G. Gail Weggeland, Salt Lake City, Utah, for SEC.

R. William Bradford, Richard L. Blanck and John P. Ashton, Salt Lake City, Utah, Trustees, for defendant.

## MEMORANDUM ORDER AND OPINION APPROVING TRUSTEE'S PLAN OF DISTRIBUTION

(In lieu of Findings of Fact and Conclusions of Law under Rule 52(a))

ALDON J. ANDERSON, District Judge.

This case arises out of a liquidation proceeding commenced by the Securities and Exchange Commission (SEC) against Associated Underwriters, Inc., (Associated), a stock brokerage firm, pursuant to the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa *et seq.* The SEC brought the action pursuant to the authority conferred in 15 U.S.C. § 78u(e), and this court has jurisdiction by virtue of 15 U.S.C. § 78aa.

On September 10, 1973, the SEC filed a complaint and an application for a temporary restraining order against Associated alleging violations of the Securities Exchange Act of 1934 and moved, *inter alia,* for the appointment of a temporary receiver. On September 11, 1973, this court granted the SEC's motion for a temporary restraining order and also issued an order adjudicating that the customers of Associated were in need of protection under the Securities Investor Protection Act of 1970. A trustee was appointed and an orderly liquidation of Associated was commenced.

Where appropriate throughout the liquidation, the trustee has honored Associated's customers' claims by delivering securities to some and by paying others cash sums out of advances made to him by the Securities Investors Protection Corporation (SIPC). In the process of the liquidation, nine claims were filed in which the claimants were unsatisfied with the trustee's proposed distribution or satisfaction of the claims involved. On April 30, 1974, the trustee filed an application with this court for a hearing to allow these claimants the opportunity to object to the proposed distribution plan in their regard. The requested hearing was granted and this memorandum order and opinion centers around the legal issues raised by the claimants' objections to the trustee's proposed distribution. The trustee, the nine claimants, and SIPC have briefed the issues and a two-day trial was held on November 7 and 8, 1974, for the purpose of receiving testimony and evidence to enable the court to make certain findings of fact necessary for the resolution of the legal issues. At the close of the trial, arguments of counsel were heard. Subsequent to the trial, each of the parties filed findings of fact and conclusions of law and post-trial briefs.

## THE SECURITIES INVESTOR PROTECTION ACT (SIPA)

The Securities Investor Protection Act (SIPA) was passed by Congress in 1970 in order to afford some protection to public

customers against financial loss as a consequence of the bankruptcy of their stockbrokers. The legislation contemplates the appointment of a receiver or trustee in the event of the insolvency of a broker who is covered by the terms of the SIPA, and to the extent the broker's assets are insufficient to satisfy his customer obligations, the SIPC, an entity established by the SIPA, is authorized to advance funds to pay claims in relation to securities up to $50,000 per customer, of which no more than $20,000 represents reimbursement of cash. SIPC is not an insurer, nor does it guarantee that customers will recover their investments which may have diminished as a result of, among other things, market fluctuations or broker-dealer fraud.[1]

A claimant can only recover under the SIPA if he fits the customer definition in 15 U.S.C. § 78fff(c)(2)(A)(ii). The defined customers are persons who have claims on account of securities received, acquired, or held by the stockbroker. The preferential protection of the SIPA is accorded to persons who can trace and identify property or funds in the hands of the broker; otherwise, a claimant must look to the general assets of the stockbroker for satisfaction. *SEC v. Kenneth Bove & Co., Inc.,* 378 F.Supp. 697, at 699 (S.D.N.Y.1974). One can be a customer only if his property has been "received, acquired or held" by the stockbroker as of the filing date. Congress intended to protect only those who entrusted property to the stockbroker. *SEC v. Horizon Securities, Inc.,* Civ. No. 72–5112, at 5 (S.D.N.Y. May 31, 1974); *SEC v. Baroff,* 497 F.2d 280, 283 (2d Cir. 1974); *SEC v. Kenneth Bove & Co., Inc., supra.*

The account of a customer is valued as of the day when proceedings are instituted against the broker—the filing date—and customers are entitled only to (1) their "specifically identifiable property," if any, and (2) the satisfaction of their "net equities," if any, out of a "single and separate fund" as designated in the SIPA. "Specific identifiable property," as defined in 15 U.S.C. § 78fff(c)(2)(C),[2] is property which is entrusted to a stockbroker by a customer and at the filing date has remained in its identi-

---

1. The court in *SEC v. Packer, Wilbur & Co., Inc.,* 498 F.2d 978, 983 (2d Cir. 1974) stated:
   SIPA [the 1970 Act] was not designed to provide full protection to all victims of a brokerage collapse. Its purpose was to extend relief to certain classes of customers.

2. 15 U.S.C. § 78fff(c)(2)(C) provides:
   *Specifically identifiable property.*—The trustee shall return specifically identifiable property to the customers of the debtor, entitled thereto. No cash or securities at any time received, acquired, or held by or for the account of a debtor from or for the accounts of customers shall for the purposes of this paragraph be deemed to be specifically identified, unless such property remained in its identical form in the debtor's possession until the filing date, or unless such property was allocated to or physically set aside for such customers on the filing date. In determining whether property was allocated to or physically set aside for such customers, it shall be sufficient that on the filing date:
   (i) securities are segregated individually, or in bulk for customers collectively;
   (ii) in the case of securities held for the account of the debtor as part of any central certificate service of any clearing corporation or any similar depositary—
   (I) the records of the debtor show or there is otherwise established to the satisfaction of the trustee that all or a specified part of the securities held by such clearing corporation or other similar depositary are held for specified customers, or for customers collectively, and
   (II) such records of the debtor also show or there is otherwise established to the satisfaction of the trustee the identities of the particular customers entitled to receive specified numbers or units of such securities so held for customers collectively; or
   (iii) such property is held for the account of customers of the debtor in such other manner as the Commission, for the protection of customers and other creditors, on a fair and equitable basis, by rule or regulation shall have determined to be sufficiently identifiable as the property of such customers. If there is any shortage in securities of the same class and series of an issuer so segregated in bulk or otherwise held for customers pursuant to this subparagraph, as compared to the aggregate rights of particular customers to receive securities of such class and series, the respective interests of such customers in such securities of such class and series shall be prorated, without prejudice, however, to the satisfaction of any claim for deficiencies as otherwise provided in this section.

cal form in the stockbroker's possession or property which has been allocated to or physically set aside for such customer on the filing date.[3] "Net equity," as defined in 15 U.S.C. § 78fff(c)(2)(A)(iv),[4] "is in substance the total value of cash and securities owed to . . . [the claimant] by the . . . [stockbroker] on the filing date, less the total value of cash and securities which . . . [the claimant] owes to the . . . [stockbroker] on that date." *SEC v. Albert & Maguire Securities Co., Inc.,* 378 F.Supp. 907, at 911 (E.D.Pa.1974). The "single and separate fund" designated in 15 U.S.C. § 78fff(c)(2)(B),[5] consists of "all property at any time received, acquired, or held by or for the account of the . . . [stockbroker] from or for the account of

customers, excepting property which can be specifically identified . . . . The fund is shared ratably by all 'customers' excluding those whose property is specifically identifiable." *SEC v. E. P. Seggos & Co.,* Civ. No. 71–542, at 6 (S.D.N.Y. June 28, 1974). To the extent that the single and separate fund is inadequate to satisfy "net equity" claims, SIPC advances are authorized under 15 U.S.C. § 78fff(f) to the specified limits. Any claims still unsatisfied are relegated to claims against the general estate and have no priority over general creditors.

The SIPA also requires that the trustee complete certain open contractual commitments of the stockbroker which were outstanding on the filing date and in which a

---

3. *See* note 5, *infra,* for the factors which determine whether property was allocated or physically set aside for a customer.

4. 15 U.S.C. § 78fff(c)(2)(A)(iv) provides:

"[N]et equity" of a customer's account or accounts means the dollar amount thereof determined by giving effect to open contractual commitments completed as provided in subsection (d) of this section, by excluding any specifically identifiable property reclaimable by the customer, and by subtracting the indebtedness, if any, of the customer to the debtor from the sum which would have been owing by the debtor to the customer had the debtor liquidated, by sale or purchase on the filing date, all other securities and contractual commitments of the customer, and for purposes of this definition, accounts held by a customer in separate capacities shall be deemed to be accounts of separate customers. . . .

5. 15 U.S.C. § 78fff(c)(2)(B) provides:

*Single and separate fund.*—All property at any time received, acquired, or held by or for the account of a debtor from or for the account of customers except cash customers who are able to identify specifically their property in the manner prescribed in subparagraph (C), and the proceeds of all customers' property transferred by the debtor, including property unlawfully converted, shall constitute a single and separate fund; and all customers except such cash customers shall constitute a single and separate class of creditors entitled to share ratably in such fund on the basis of their respective net equities as of the filing date and in priority to all other payments, except that (i) there shall be repaid to SIPC, in priority to all other claims payable from such single and separate fund,

the amount of all advances made by SIPC to the trustee to permit the completion of open contractual commitments pursuant to subsection (d) of this section, and (ii) to the extent that any other assets of the debtor may be available therefor or as otherwise ordered by the court, all costs and expenses specified in clauses (1) and (2) of section 104(a) of Title II shall be paid from such single and separate fund in priority to the claims of such single and separate class of creditors, and any moneys advanced by SIPC for such costs and expenses shall be recouped as such. If such single and separate fund shall not be sufficient to pay in full the claims of such single and separate class of creditors, the creditors of such class shall be entitled, to the extent only of their respective unpaid balances, to share in the general estate with general creditors. In, or for the purpose of, distributing such fund, all property other than cash shall be valued as of the close of business on the filing date. To the greatest extent considered practicable by the trustee, the trustee shall deliver in payment of claims of customers for their net equities based upon securities held on the filing date in their accounts (after giving effect to open contractual commitments completed as hereinafter provided), securities of the same class and series of an issuer ratably up to the respective amounts which were so held in such accounts. Any property remaining after the liquidation of a lien or pledge made by a debtor shall be apportioned between his general estate and the single and separate fund in the proportion in which the general property of the debtor and the property of his customers contributed to such lien or pledge.

customer had an interest.[6] Transactions involving only a stockbroker and his customer are not contractual commitments contemplated by the SIPA. Transactions can only be completed under this provision when customer interest can be shown in inter-broker or inter-dealer transactions. The Third Circuit Court of Appeals considered this question in *SEC v. Aberdeen Securities Co., Inc.,* 480 F.2d 1121, 1125–26 (3d Cir. 1973) and stated:

> The District Court ruled that undertakings involving only the debtor and his customers are not the contractual commitments contemplated by subsection (d), and therefore the Trustee could not be forced to satisfy this claim in kind. We agree with the conclusion of the learned Court below.
>
> Our review of the legislative history of the Act and the testimony by various witnesses before committees of both the Senate and the House convinces us that the open contractual commitments covered by § 6(d) are those between the debtor and another broker-dealer.
>
> The securities industry was concerned with the "domino effect" of the financial difficulties of one broker extending to others with whom he dealt and wished to isolate problems to the one who was insolvent if at all possible. However, there was considerable sentiment in Congress to limit the protection of the Act to customers and not to extend it to transactions between brokers. The compromise ultimately agreed upon was to provide for completion of interbroker or inter-dealer transactions only when the interest of a customer on either side was involved.

The foregoing summarizes the main provisions of the SIPA. The trustee by 15 U.S.C. § 78fff(g) is required to satisfy promptly, up to the statutory limits, customers' claims for specifically identifiable property or net equities by the delivery of specifically identifiable securities or cash, or the distribution of cash or securities out of the single and separate fund, or cash payments derived from SIPC advances. This distribution and the completion of open contractual commitments in inter-broker transactions in which customer interest is involved are among the primary responsibilities of the trustee. If a customer has a valid claim under a liquidation proceeding commenced under the SIPA, a computation is made to arrive at the dollar amount of the customer's account by (1) excluding from it specifically identifiable property which is returned to him, (2) deducting indebtedness and other obligations, if any, to the insolvent broker, and (3) by giving effect to certain open contractual commitments. *SEC v. Aberdeen Securities Co., Inc., supra* at 1124.

As the foregoing demonstrates, SIPC does not simply pay claims as would an insurer. Section 78fff(c)(2)(B) of the SIPA provides that to the greatest practicable extent, customers' net equities should be paid in the form of securities held in their accounts on the filing date. Section 78fff(b)(2) of the SIPA provides that the trustee has no duty to reduce securities in the single and separate fund to cash. Each of these principles bears upon the question of whether the claimants are entitled to receive anything under the provisions of the SIPA.

## FACTS

Prior to these liquidation proceedings, Associated was a stock brokerage firm engaged in the segment of the securities industry involving puts, calls, and straddles options,[7] and also what Associated termed

---

6. 15 U.S.C. § 78fff(d).

7. *PUT AND CALL OPTIONS.* An option is a negotiable contract with the privilege existing in one person, for which he has paid money called a "premium," which gives him the right to buy certain specified securities from another person, if he chooses, at any time within an agreed period, at a fixed price, or to sell securities to another person at an agreed price and time. If the option gives the choice of buying or not buying, it is denominated a "call." If it gives the choice of selling or not, it is called a "put." If it is a combination of both these, and gives the privilege of either buying or selling or not, it is called a "straddle."

Therefore, a "put" is a contract which gives the holder the right for a stated period of time to sell a specified number of shares of a stock

"conversion investment contracts." [8]   The nine claimants in this matter are Royal Garff, Maxine Garff, Royal and Maxine Garff, Mattie Dell Rupper, Warren R. Rup-

to the writer of the contract at a price per share which was fixed at the time when the option was bought.  A "call" is a similar contract which gives the holder the right to purchase stock from the writer at a fixed price.  A "straddle" is a combination of a put and a call giving the holder the right to both buy and sell a specified number of shares of a stock at a fixed price.  These contracts are exercised at the holder's discretion.

The exercise price of "contract price" or "striking price" is the price at which the buyer of a call can purchase the stock from the writer during the life of his option or the price at which the buyer of a put can sell the stock to the writer during the life of the option.  This price can be the market price of the stock at the time the option is purchased, or in the case of a put it might be a stated number of points below the market price, or in the case of a call it might be a stated number of points above the market price.

Options are written on a standard contract form adopted by the Put and Call Brokers and Dealers Association and are generally for 100 shares.  The Association requires that all options be endorsed or guaranteed by member firms of the New York Stock Exchange so that if the writer should fail to perform, the New York Stock Exchange member is liable.  This endorsement makes put and call options acceptable anywhere, regardless of who the writer may be, so that they are fully negotiable instruments.

Options may originate with the writer who wishes to sell an option on stock in his portfolio or the option may originate through the demand for a particular option by a potential buyer.  In the latter instance, the buyer will generally go to his stockbroker who contacts a put and call dealer for the required option.  The put and call dealer may know a writer who would be willing to sell such an option or the dealer may contact another put and call dealer or a New York Stock Exchange endorsing firm with customers who frequently write options.  The put and call dealer negotiates the price of the option with both the buyer and seller and makes his profit through the difference between the two prices.  The dealer then fills out the put and call option form which he has obtained from the Put and Call Brokers and Dealers Association and sends it to the writer's broker, a New York Stock Exchange member, for endorsement.  The endorsed option is then returned to the put and call broker who forwards it to the buying customer's broker.  The customer's broker receives a commission which is included in the gross sale price paid by the customer.

There has generally been a greater demand for calls than puts and consequently call options are higher priced than puts.  This has resulted in the growing popularity of straddles and the practice of "converting" options.  Writers who are willing to both acquire or lose stock at a price below or above the current market, respectively, will write straddles.  It is unlikely that both sides of the straddle will be exercised and the writer can obtain a higher premium for a straddle than for a put or a call alone.

Because of the greater demand for calls than puts and the desire of writers to write straddles, certain New York Stock Exchange firms will "convert" or exchange puts for calls or calls for puts for a fee.  They look upon their activity as a form of riskless investment in which their money earns interest at a rate of at least one-half of one per cent more than the call loan rate.  The put and call dealer who has buyers for two calls on the same stock will buy a straddle from a writer.  The dealer exchanges the put for a call with the conversion firm and pays the conversion house at an annual rate of a certain percentage (depending on the call rate at the time and the firm's policy) plus the cost of two floor brokerage fees and taxes on the stock involved in the option.  The interest is computed on the value of the stock in the option for the length of the option.  The conversion house is the writer of the call and the call is written with the same terms (i. e., expiration date and exercise price) as the put for which it was exchanged.  Simultaneously, the conversion firm buys the stock on the Exchange.  If the call is exercised, the conversion firm supplies the stock it has bought.  If the call is not exercised, the firm disposes of the stock by exercising the put which it holds.  It should be noted that an option will be converted only when the difference between the price of a put and a call is great enough to absorb the cost of converting.

When calls are converted to puts, the converting firm writes a put and sells the stock short.  At expiration date, the firm covers its short position either with the stock "put" to it under the firm's own option or with the stock the firm acquires by exercising the call which it held.  *See* SEC, Report on Put and Call Options, at 5–19 (1961).

8.  A conversion investment contract is defined by Associated as a simultaneous acquisition by a converter investor [one who purchases such a contract] of a put acquired through his broker-dealer as a part of a straddle, the acquisition of the number of shares of the stock covered by the put at the price specified therein and the simultaneous writing of a call option at the same price as the put option with the same expiration date.  *See* Bruce A. Jensen's Exh. 2, at 2.

per, Ruth Lowry, Rhoda Y. Johnson, Tanner Memorial Clinic Employees Profit Sharing Trust, and William Naylor. These claimants were purchasers of these so-called "conversion investment contracts."

In 1970 or 1971 each of these claimants deposited a sum or sums of money at various times with Associated. These deposits were made after certain discussions with persons acting on behalf of Associated and after each claimant understood that his cash would be utilized in securities transactions which Associated characterized as "converter transactions." The parties to this action have stipulated that the "converter transaction," which constituted the use of claimants' funds by Associated, operated as follows:

[E]ach Claimant placed funds with Associated.

(3) Such funds were used in the following manner:

(a) From time to time, in its sole discretion and without instructions from the Claimant, Associated entered into the following simultaneous transactions: (i) purchase and carry in the Claimant's account shares of publicly held common stock (hereinafter "Common Shares") selected by Associated; (ii) purchase and carry in the Claimant's account a Put covering such Common Shares, having a Striking Price equal to the purchase price of such Common Shares; (iii) cause a Call to be written in the Claimant's name covering such Common Shares, having the same Expiration Date and Striking Price as the Put; and (iv) sell the said Call to a third person for a cash amount (hereinafter "Premium"). For convenience only, the foregoing is hereinafter referred to as "Converter Transaction."

(b) The Claimant received a certain sum of money (hereinafter "Claimant's Premium") paid or credited to him by Associated at or about the time of the execution of the Converter Transaction, either upon or prior to Associated's receipt of the Premium paid by the purchaser of the Call.

(c) Associated exercised a Put at or prior to its Expiration Date in the event the Call covering the same Common Shares had not been previously exercised, extended the Expiration Date of a Put when that would be appropriate, and reinvested the proceeds received upon the exercise of a Put or a Call in another Converter Transaction.

(d) The account carried for the Claimant was credited with the proceeds received by Associated upon the exercise of either the Put or the Call.

\* \* \*

(5) In the course of executing Converter Transactions, Associated from time to time sent to each Claimant confirmations thereof and statements with respect thereto.

(6) As of the Filing Date [the date the liquidation was commenced], the books and records of Associated reflected the long and short securities positions and credit balances carried in the account of each Claimant . . ..

(7) All of the Puts reflected . . . bore the Endorsement of Associated, and Jerald Investment was the Writer of all such Puts. These facts were not reflected in the confirmations or statements referred to in paragraph 5.

(8) Jerald Investment was the nominee name of Associated, and it had no separate assets or business other than the assets and business of Associated as of the Filing Date.

\* \* \*

(11) Neither the trustee nor the predecessor trustee has exercised any of the Puts held in the Claimant's account which were unexpired as of the Filing Date. Associated informed both trustees that there were various unexercised unexpired options in the possession of Associated (both Puts and Calls) of which the trustees should be aware.

(12) The market value of the Common Shares carried in the Claimants' accounts at the Filing Date is presently and has

been since the Filing Date lower than the Striking Price of each Put covering those shares. (*See* Stipulation of Facts filed November 1, 1974).

At trial evidence was adduced which convinces the court that in the discussions with representatives acting on behalf of Associated each claimant was made to understand that his funds would be used as explained above, but within a broader framework as follows: Representatives of Associated would maintain daily contact with stockbrokers around the country to determine which investment bankers were looking for put or call options. Proceeds of claimants' investments would then be used to finance transactions out of which the particular options requested could be generated. These options were to be guaranteed by the endorsement of a New York Stock Exchange member brokerage firm or a broker-dealer who was not a member firm, including Associated. Associated, as a broker-dealer, would convert or change a put option into a call option or a call option into a put option for the benefit of clients of Associated. This would be accomplished by the purchase of a block of securities at a price with a hedge requiring the repurchase by another party at the same price under terms of a previously negotiated contract. The hedge consisted of put and call options issued at the same time as the purchase of the underlying security. Claimants were told that as "converters" they would assume no market risk because of the hedge of the options and that the only return they could anticipate

would be the premium which would be earned or paid at the time of the conversion transaction. Claimants were assured that they would receive the highest return available on investments without risk.[9]

## POSITIONS OF THE PARTIES AND ISSUES PRESENTED

Under the SIPA, the trustee proposes to return to claimants, as specifically identifiable property found in their accounts as of the filing date, (1) credit cash balances, if any, and (2) the certificates or other instruments representing common shares or puts.[10]

The claimants oppose such a distribution and seek the return of their cash investments measured by the striking price of the puts which exceed the market value of the underlying stock. In the alternative, claimants allege that they purchased from Associated an investment contract as presumably specified in section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), and section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), and they petition for payment of their net equity in this alleged investment contract which they claim is comprised of the original monies invested plus earned but unpaid premiums which have been reinvested by Associated.

Under the facts of this case and within the respective theories of the parties, the court must decide what distribution each claimant is entitled to receive in satisfaction of his claim as a customer of Associated within the meaning of the SIPA. The

**9.** Associated distributed a document which was prepared to explain the conversion function. It read as follows:

THE CONVERSION FUNCTION

The "Conversion" function is a facilitating transaction which allows the option broker-dealer to "convert" or change a Put option into a Call option, or conversely, a Call option into a Put option for the benefit of its clients. It is, in essence, the "floor planning" of securities at a stipulated price until repurchased by another party at the same price under terms of a previously negotiated contract.

The "Converter" finances this facilitating transaction but in so doing assumes no market risk since he is guaranteed that the secur-

ity position into which he enters will be liquidated at the same price within a stipulated period of time. This protection comes in the form of an option which offsets the Converter's securities position: i. e., a Put option in the case of stock long, and a Call option in the case of stock short. The offsetting option provides guaranteed protection through the endorsement of a third party escrow bank, a sample of which is attached.

For providing this service, the Converter is paid interest in advance on the funds used to finance the purchase. (Exh. R–8.)

**10.** The trustee also proposes to return the value of two missing puts claimed by the Ruppers and also one owed to Tanner Memorial Clinic.

pretrial order preserved the following issues:

(1) Did the arrangement between Associated and any claimant constitute an investment contract under the Federal Securities Laws?

(2) What distribution is each claimant entitled to receive in satisfaction of his claim as a "customer" of Associated within the meaning of the SIPA?

(3) Does any claimant have a right of recovery based upon the fact that the trustee did not exercise unexpired puts remaining in his account subsequent to the filing date?

■ After a study of the act in question, the court is of the opinion that the SIPA is narrowly drawn and contemplates the return of a customer's property in the traditional form of stocks, bonds, cash, etc., that a stockbroker holds or should be holding in the customer's account rather than the return of the value of what might be termed property or property rights involved in carrying out an investment contract which uses or trades in traditional forms of stocks, bonds, cash, etc., where, as here, the broker is to exercise investment judgment and expertise in the actual investment of these in the risk-free production of financial return for the customer. The trustee in this case is willing to return all stocks, bonds, cash, options, etc., that are found in claimants' accounts, and in the court's opinion this is exactly what is contemplated by the SIPA. Even if there be question as to this construction, nevertheless, claimants' theory, which the court will follow to its conclusion, still does not support a finding favorable to them.

*INVESTMENT CONTRACT*

The claimants allege that the arrangement that existed between themselves and Associated constituted an investment contract composed of the following elements:

1. Stock was to be selected in the sole discretion of Associated.

2. A put option would be issued allowing the claimants to require a third party to purchase the subject stock at the same price paid by Associated and a call option would be sold to a third party.

3. The premium payment for sale of options would be partially retained by Associated and an agreed balance would be paid to claimants.

4. The underlying stock would be placed in escrow with an escrow bank to assure delivery of the stock on exercise of the option contracts.

5. The option contracts would be indorsed and guaranteed by a New York Stock Exchange firm or a brokerage house of equivalent financial responsibility.

6. Associated would be responsible to make certain that, the put options were either exercised or extended.

It is disputed whether or not Associated in fact represented that each option would be endorsed by a member brokerage firm of the New York Stock Exchange. This dispute, however factually important it may be in other respects, does not affect the determination that claimants did purchase an investment contract.

■ The traditional definition of an investment contract was stated in *SEC v. W. J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946) as follows:

[A] contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

The Court added that the definition embodies a flexible rather than static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.

*Id.* at 299, 66 S.Ct. at 1103.

The Court also stated that

[t]he test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.

*Id.* at 301, 66 S.Ct. at 1104.

It is undisputed that the claimants' investments meet three of the four requirements of the *Howey* definition set out above. That is, claimants invested money and were led to expect profits solely from the efforts of Associated or its personnel. The trustee, however, argues that there can be no investment contract because there is no investment in a "common enterprise" as required by *Howey*. The trustee argues for a test of commonality along horizontal lines by emphasizing that each claimant (1) made an individual bargain with Associated, (2) had a separate and distinct account, (3) was not dependent on the accounts of any other investor for realization of profit, and (4) never authorized any commingling of funds or trading between or among respective accounts.

The question of commonality in the definition of investment contract has created inconsistent positions among the courts. A number of courts interpret "common enterprise" to mean a relationship among investors in which their monies or investment proceeds are pooled in the enterprise. *See Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274 (7th Cir. 1972), *cert. denied*, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972);[11] *Wasnowic v. Chicago Board of Trade*, 352 F.Supp. 1066 (M.D.Pa.1972); *Stuckey v. duPont Glore Forgan, Inc.*, 59 F.R.D. 129 (N.D.Cal.1973). This horizontal approach is opposed to a vertical approach where the investor's monies become part of the enterprise between the investors and the promoter. *See Los Angeles Trust Deed & Mortgage Exchange v. SEC*, 285 F.2d 162 (9th Cir. 1960); *Maheu v. Reynolds & Co.*, 282 F.Supp. 423 (S.D.N.Y.1967); *Berman v. Orimex Trading, Inc.*, 291 F.Supp. 701 (S.D.

N.Y.1968); *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973); *Mitzner v. Cardet International, Inc.*, 358 F.Supp. 1262 (N.D.Ill.1973); *Marshall v. Lamson Bros. & Co.*, 368 F.Supp. 486 (S.D. Iowa 1974); *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414 (8th Cir. 1974); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974); *SEC v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974).

While common enterprise can be expressed in several ways, it would seem that the prevailing view among the courts, which is growing steadily, is the interrelationship between the investor and the promoter rather than some pooling or sharing concept among the investors themselves either with or without the promoter. Although there is reputable authority to the contrary, for purposes of this case the court is inclined to the vertical relationship approach adopted by the Ninth Circuit in *Securities &· Exchange Commission v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973). That court defined a common enterprise as "one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investments or. of third parties." *Id.* at 482 n.7.

■ The claimants' investments, in the instant case, were part of the enterprise between themselves and Associated. With this element of commonality established, the court finds that an investment contract existed. The mere existence of an investment contract, however, is still not determinative of claimants' entitlement to protection under the SIPA.

Within their theory of an investment contract, claimants contend that the most important element of their investment contracts was not in their accounts on the filing date, i. e., an endorsement by a New

11. In discussing "common enterprise," the court in *Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274 (7th Cir.), *cert. denied*, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972) cites approvingly the Tenth Circuit decision of *Continental Marketing Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967). The court, however, has read this opinion and is convinced that the Tenth Circuit therein makes no determination as to whether "common enterprise" is meant to define a vertical or horizontal relationship between promoter and investor.

York Stock Exchange member or other brokerage house of equivalent financial responsibility which would guarantee the exercise of the option if the writer of the option failed to perform. They further contend that since this alleged security cannot be returned to them in the form in which they bought it, a cash net equity payment from SIPC is due them, measured by the striking or contract price of the put contracts in their accounts since the market was declining.

The trustee and SIPC contend that claimants' characterization of the investments in this case as investment contracts does not aid them in coming within the protection of the SIPA, and that claimants must lose within their own theoretical framework because factually an endorsement by a member brokerage firm of the New York Stock Exchange was never an element of the investment contract. In opposition to claimants' theory, the trustee and SIPC further argue that the terms of the investment contract allowed Associated to endorse the options; at the filing date all the elements of the investment were present including an endorsement; Associated was the endorser; however, the endorsements were worthless due to Associated's inability to perform.

The preponderance of credible testimony and documentary evidence supports the position of the trustee and SIPC, that the investment contract, as represented by Associated, did not require that the options would always be endorsed by a member brokerage firm of the New York Stock Exchange.

Associated's President, Bruce A. Jensen, filed an affidavit with the court on July 1, 1974, in which he stated:

11. Affiant believes and therefore affirms that at the time of his introduction to each . . . [claimant] or his or her representative, affiant explained that options to be acquired as components of conversion investment contracts would be endorsed either by a New York Stock Exchange member or a broker-dealer who was not a member of the New York Stock Exchange, including Associated.

Mr. Jensen also reaffirmed this position in his testimony at trial. (T. 70, 81, 109.) Mr. Sherman Young testified at trial that endorsement of the options by a member of the New York Stock Exchange was not an essential element to claimant Tanner Memorial Clinic (T. 148) and this disclaimer was stipulated at trial as binding on claimants Johnson and Lowry. (T. 169.) Claimant Naylor did not suggest in his testimony that endorsement even played a role in his investment decision. Although claimants Warren Rupper and Royal Garff testified that Associated represented that the options would bear a New York Stock Exchange member's endorsement, the testimony seems in conflict. (T. 214–15.) They were not in agreement with a flyer marked Exhibit R–8 which was used to explain the investment contract to some, if not all, of the claimants, and which indicated that endorsement would be by a third party escrow bank.

Based upon the foregoing, the court finds that the endorsement element of the investment contract did not contemplate endorsement only by a member firm and the New York Stock Exchange. Based upon this finding and the stipulated facts cited herein, the court further finds that none of the elements of the investment contracts were missing from claimants' accounts on the filing date. The options found in claimants' account on the filing date were written by Jerald Investment, a nominee name of Associated, and were endorsed by bankrupt Associated. The put options in claimants' accounts were valueless on the filing date due to both the nature of the writer of the options (Jerald Investment) and the endorser (Associated). The trustee has the obligation to return the stock and the options in claimants' accounts as specific identifiable property. The 1970 Act does not insure the type of unfortunate circumstances that have occurred in this case.

The court expresses no opinion on the applicability of the SIPA if the invest-

ment contract had expressly required endorsement by a member firm of the New York Stock Exchange. The resolution of the issues in the case also makes it clear that the claimants have no right of recovery based upon the fact that the trustee did not exercise the unexpired puts remaining in their accounts subsequent to the filing date because the options, written by Jerald Investment and endorsed by Associated, were worthless due to the insolvency and inability of both the writer and endorser to perform. Under the SIPA, claimants are entitled to the return of that which they deposited with Associated or that for which the original deposit was exchanged pursuant to the agreement with Associated. The evidence fails to show that Associated was only empowered to purchase endorsements from member firms of the New York Stock Exchange. Therefore, as customers under the SIPA, claimants are entitled to receive a satisfaction of their claims in conformity with the trustee's proposed plan of distribution.

### MOTION OF BRUCE A. JENSEN

On July 1, 1974, Bruce A. Jensen, President of Associated, filed a motion for an order requiring the trustee to allow the claimants' claims and also filed a memorandum in support thereof and in opposition to the trustee's proposed plan of distribution, accompanied by an affidavit. Mr. Jensen has proceeded as a party but has not been named or joined as a party in this action. The trustee and SIPC have moved that Mr. Jensen's motion be denied on the grounds that he has no standing in this controversy.

This proceeding was commenced by SIPC's application filed the day following a separate action commenced by the SEC seeking the appointment of a temporary receiver and other relief. Mr. Jensen has not been named, even nominally, as a party. The trustee has initiated no action against him and the resolution of these nine claims does not involve any legally cognizable interest of his. The trustee and claimants have raised all applicable issues and each party is represented and capable of protect-

ing his own interest. Mr. Jensen's pending motion is dismissed on the ground that he is neither a party to this action nor does he have standing herein.

IT IS SO ORDERED.