**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Bruce A. JENSEN, Defendant-Appellant.**

**No. 78–1194.**

United States Court of Appeals, Tenth Circuit.

Argued Jan. 26, 1979.

Decided Nov. 5, 1979.

---

Harold G. Christensen, Salt Lake City, Utah (Richard K. Crandall, Salt Lake City, Utah, with him on the brief), of Snow, Christensen & Martineau, Salt Lake City, Utah, for defendant-appellant.

Max D. Wheeler, Asst. U. S. Atty., Salt Lake City, Utah (Ronald L. Rencher, U. S. Atty., Salt Lake City, Utah, with him on the brief), for plaintiff-appellee.

Before HOLLOWAY, BARRETT and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

This appeal is from a jury verdict that found defendant Bruce Jensen violated section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), by committing fraud in the sale of certain securities.

Jensen argues several issues on appeal, including contentions of 1) a fatal variance between proof and the indictment; 2) collateral estoppel (from a civil case involving nine of Jensen's allegedly defrauded investors); 3) erroneous evidentiary rulings; and 4) an erroneous ruling on a defense motion for production pursuant to Fed.R.Crim.P. 16.

During the pertinent times Jensen was the sole owner and principal of Associated Underwriters (Associated), formed to serve primarily as a stock brokerage firm dealing in put and call options. Essential to the operation was enlisting converter-investors whose funds would be utilized to "convert" calls into puts. Associated and the investors entered into a so-called conversion investment contract, which had the following elements. The investor's funds were to be utilized to purchase certain securities selected by Associated. Next, a "call" option was to be sold to someone who wanted an option to buy that security at a specified price, normally the price at which it was purchased. The premium paid for the call option was to be used to acquire a "put" option to sell the same number of shares of the same security on demand during a specified period, normally at the price the stock was purchased. Thus, assuming a writer of the put option financially able to perform the promise to buy, the investor's funds would not be subject to market loss, because the put writer could be forced to take the stock for the price specified in the agreement even though the market price has fallen. As an additional safety precaution, the put options were to be guaranteed. Under the conversion investment agreement the investors were to receive a fixed return on their investment.

All but two of the investors involved here had entered into their investment contracts with Associated more than five years before the return of the indictment against Jensen. Although the investors' moneys out-of-pocket were provided at the time the contracts were entered, funds in their accounts resulting from the conversion process were continually reinvested by Associated. Evidently the conversion process functioned smoothly during the first portion of the investors' involvement with Associated. In November 1972, however, Associated sustained a loss in excess of $300,000 from fraudulent activities of David Nemelka, one of its customers. After deciding the firm could continue in business, Jensen made various capital contributions. But the firm

continued to experience financial difficulties and finally was adjudged to be bankrupt in August 1973.

During this period of financial instability the investment accounts were in the following shape. Stocks had been sold to the accounts at prices far in excess of their actual market values. Many of these stocks had been previously owned by Jensen as a consequence of the stock fraud perpetrated on him in 1972. With respect to such stocks Jensen, his wife, or one of his wholly-owned corporations served both as the writer of the put option and the buyer of the call option. The put options were not guaranteed by an independent third party, but by Associated. Thus, in effect Associated was guaranteeing its own legal obligations. Because of its financial difficulties and then bankrupt status, Associated was unable to perform on either the put options or the guarantees. The investors were left with stock that had no market value, losing more than $100,000.

## I

■ Jensen's initial argument on appeal focuses on an alleged variance between the proof and the indictment. The indictment alleges fraud in the sale of those common stocks found in the investor's accounts at the time of Associated's bankruptcy. Jensen takes the position that the security actually sold to the investor was a three-part investment contract consisting of a put, a call, and the underlying stock, and was not the individual shares of common stock. He points out that the investors took no part in choosing which stocks would be used in the conversion process, but instead made only the initial financial commitment that he then continually reinvested. Jensen also argues that the government produced no evidence of fraud in the sale of the common stocks because they were not sold to the investors, and therefore no violation of section 17(a) was proved.

We do not accept this analysis. Customers often give brokerage firms great leeway in making investment decisions for their accounts; purchases on their behalf by the brokers are still sales to the customers. The key here is whether the customers owned the stocks in the accounts, or whether the obligation of Associated to the investors was simply that of debtor and creditor.

Jensen told the investors their money would be used to buy stocks, but in a way that would give a fixed return rather than a return subject to the risks of the market. The investors' money was used to buy specific stocks, which were then placed in the individual accounts, with each investor being notified what had been bought for his or her account. Upon bankruptcy, the investors received only the stocks in the accounts. This is not essentially different, in our view, from a regular brokerage account when the discretion over investment is vested in the broker. Each sale of stock to the accounts, therefore, must stand on its own and be judged in the context of the agreement with the investors.

■ Did the government prove fraud in the sale of the common stocks? To prove a violation under section 17(a)(2) or (3) the government must show the defendant sold a security,

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Whether fraud within the meaning of the language of (2) and (3) existed is a fact question, and the jury found against defendant. There is ample evidence in the record to support this finding.

Jensen represented to the investors at the time the agreements were entered into that the investments would be "risk free," because of the put option safeguard and the guarantee by a financially secure institution such as a broker member of the New

York Stock Exchange or a federally insured bank. This was the method of operation initially, but it changed as Jensen continued to reinvest the money. An investment based upon a guarantee by Associated of its own legal obligation at a time when it was facing financial trouble, and put and call options written by Jensen and his companies on essentially worthless stock, owned by Jensen and sold to the accounts, is very different from the one represented in the beginning. The investors testified they relied on the safeguard and guaranteed aspects of the scheme in entering into the transactions. Failing to inform the investors of the changes in the nature of the investment clearly constitutes a material omission.

A finding of a fraudulent course of business can also be supported. As indicated, Jensen took stock that he had been defrauded on in another deal and knew was worth little or nothing and sold it to the investors' accounts at high prices. He set up what was essentially a sham put and call option transaction because Jensen or entities under his control held both options, guaranteed the package, and then apparently used the converter's money to keep the business afloat.

Jensen raises a final question—whether the fraud was in the sale of the common stock. He contends that "in the sale of" as used in section 17(a) must necessarily be narrower in scope than the "in connection with" language of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). He then argues that the fraud alleged here relates to the sale of the investment contract and does not have the requisite connection to the sale of stock, a peripheral transaction; therefore there is no violation of section 17(a) as alleged in the indictment.

We recognize that the "in connection with" phrase in section 10(b) has been relied upon to bring together instances of fraud and sales of securities which occur in separate transactions but are a part of a larger scheme. *See Superintendent of Ins. v. Bankers Life and Cas. Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 594–95 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974). Some schemes may be beyond the purview of section 17(a), yet come within the broad scope of section 10(b). We believe, however, the present transaction fits comfortably within 17(a).

Both sections 10(b) and 17(a) were enacted to protect investors from fraudulent practices by requiring fairness, disclosure, and the highest ethical standards in the securities business. *See SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); *SEC v. International Chem. Dev. Corp.,* 469 F.2d 20, 26 (10th Cir. 1972). Courts have recognized that section 17(a) must be given broad scope and flexible interpretation in order to encompass all the ingenious variations of security fraud that arise. *See, e. g., United States v. Brown,* 555 F.2d 336 (2d Cir. 1977).

Jensen seeks to make an artificial distinction between the sale of the investment package and the sale of the common stock. Because the value of the stock was not significant to the investors (due to the protecting guarantees) he argues in essence that there was no fraud in the sale of the stock. But fraud does not have to relate directly to the value or nature of the stock to be a section 17(a) violation. In *Norris & Hirshberg, Inc. v. SEC,* 85 U.S.App.D.C. 268, 177 F.2d 228 (D.C.Cir.1949), involving sections 17(a) and 10(b), the court said "it will be assumed that these securities in themselves are sound. . . . The case is here because of petitioner's methods of dealing with those securities and with its customers with regard to those securities." *Id.,* 85 U.S.App.D.C. at 270, 177 F.2d at 230. The broker was found to have violated the anti-fraud provisions by excessive trading of stocks between its customers' accounts to their detriment and to the broker's benefit. *See also SEC v. M. A. Lundy Assoc.,* 362 F.Supp. 226, 233–35 (D.R.I.1973) (misrepresenting the true nature of the guarantee accompanying a security sale violates section 17(a) ). Thus, the transaction the in-

vestor enters into must be examined as a whole. If the sale of stock is an element, the transaction is within section 17(a), and if fraud is involved in the transaction, there is fraud in the sale of securities. Here the investors entered into an agreement with Jensen that they would give him money and in return he would use the money to buy stock in order to generate put and call options. Fraud in this transaction is fraud in the sale of the stock.

## II

■ Jensen argues that the government should have been collaterally estopped from litigating two issues decided in a prior case, *Securities Investor Prot'n Corp. v. Associated Underwriters, Inc.*, 423 F.Supp. 168 (D.Utah 1975). This case was a bankruptcy hearing in which claimants for Associated's assets were disputing the proposed distribution plan. The real adverse parties were the same investors who are the complainants in this case and the Securities Investor Protection Corporation (SIPC), a private company set up by the federal government to protect customers of stockbrokers who go bankrupt. The SEC was involved only because it commenced the action against Associated for liquidation proceedings, pursuant to the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa *et seq.* The government contends collateral estoppel is not appropriate because neither party in the present case was a party in the prior case.

Recent Supreme Court cases have substantially eliminated the mutuality doctrine. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Blonder-Tongue Laboratories Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). *See also Brown v. DeLayo,* 498 F.2d 1173, 1176–77 (10th Cir. 1974). Therefore, collateral estoppel is not foreclosed because Jensen was not a party to the prior litigation. We hold, however, that collateral estoppel is defeated because the government was not a party to the prior case in the sense that it had a full and fair opportunity to litigate the issues now sought to be used against it.

The Securities Exchange Commission (SEC) was a nominal plaintiff in the first case, but this is not significant. "Identity of parties is not a mere matter of form, but of substance. Parties nominally the same may be, in legal effect, different, . . . and parties nominally different may be, in legal effect, the same." *Chicago, R. I. & P. Ry. v. Schendel,* 270 U.S. 611, 620, 46 S.Ct. 420, 423–424, 70 L.Ed. 757 (1926). *See also Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (government not a nominal party in first suit, but collaterally estopped because it had control over the litigation and a direct interest in the case). The test to be used is whether the party had a full and fair opportunity to litigate the issues in the prior case. *Brown v. DeLayo,* 498 F.2d 1173, 1176 (10th Cir. 1974). The SEC's only interest in the case sought to be used here was to initiate receivership and liquidation so the assets of the bankrupt could be fairly distributed; it was essentially a neutral party. The government had no real interest in whether the investors or the SIPC "won," other than, of course, a general interest that the laws be fairly administered. We hold, therefore, that the government had no opportunity to fully and fairly litigate issues in that case, in which it had no direct interest, and collateral estoppel does not apply.

## III

■ Jensen raises three alleged errors made by the judge during trial. First, he contends no evidence of transactions with any investors except Maxine and Royal Garff should have been admitted because the five year limitation period imposed by 18 U.S.C. § 3282 had expired since those contracts were entered. *See Carroll v. United States,* 326 F.2d 72, 86 (9th Cir. 1963). But the statute of limitations is no bar if there is an ongoing scheme continuing into the five year period. *See United States v. McDonald,* 576 F.2d 1350, 1357 (9th Cir. 1978), *cert. denied,* 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1979); *United States v. Stein,* 456 F.2d 844, 850 (2d Cir.), *cert. denied,* 408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333 (1972).

We have already ruled that the transaction was not complete when the investment agreement was executed, but continued as long as the stocks were purchased for the investors' accounts. The material omissions occurred within five years of the indictment; the evidence on what occurred before the five year period was admissible because it showed representations that made the later omissions misleading. *See United States v. Blosser,* 440 F.2d 697, 699 (10th Cir. 1971).

■ Second, Jensen claims the trial court erred in refusing to allow his accountant witness, Steven White, to reappear to clarify his testimony the day after the judge had allegedly confused and intimidated the witness on the stand. We find no error. The manner of conducting of the trial is within the trial judge's discretion and will not be disturbed on appeal unless clearly prejudicial. *Darby v. United States,* 283 F.2d 896 (10th Cir. 1960). White had full opportunity to testify when he was on the stand. The court's interjections may have been intimidating, but they did not reach the point of denying defendant's right to offer testimony of witnesses. The trial judge denied White a second chance on the stand for administrative reasons, after hearing the proffered testimony and concluding it was essentially the same as that given the day before. This is clearly within the court's power under Fed.R.Evid. 611(a), which gives the judge control over the interrogation of witnesses to "avoid needless consumption of time."

■ Finally, Jensen alleges error occurred during the rebuttal testimony of Frank Langheinrich, the government's expert. Langheinrich was allowed to testify on the interpretation of certain self-regulating rules of the National Association of Security Dealers (NASD) and their effect on the computation of Associated's financial status. This, it is argued, called for a legal conclusion. We do not agree. This Court has recognized that an expert witness cannot state legal conclusions by applying law to the facts, passing upon weight or credibility of the evidence, or usurping the prov-

ince of the jury by telling it what result should be reached. *See Frase v. Henry,* 444 F.2d 1228, 1231 (10th Cir. 1971). In the instant case, however, the testimony was with respect to a self-governing rule of a private association, not an unadorned legal conclusion. In addition, this testimony is so collateral to the main issue in the case that it can hardly be said to have invaded the province of the jury. We hold the testimony was properly within the area of an expert's opinion.

■ Jensen also asserts Langheinrich's testimony was based on a NASD rule not in effect at the time Associated's financial condition was in question. The government contends there was such a rule in existence at that time, but Langheinrich miscited it. Whether such a rule did indeed exist then is a question of fact. Jensen made no objection at trial, nor did he try to impeach the witness on this ground (apparently because he was not aware of any error at the time). The government's case might have been hurt if Langheinrich's testimony had been impeached on this ground at trial. But a defendant cannot have a trial reversed because of his failure to put on evidence, when that failure is in no way caused by the court or the prosecution. Accordingly, we reject Jensen's claim.

## IV

Finally, we consider Jensen's motion to compel disclosure of evidence under Fed.R. Crim.P. 16. A request for discovery was filed October 14, 1977. When the government did not respond, a motion to compel discovery was filed November 11 and heard November 23, only a few days before the trial date of December 5. The date for the trial had been firmly set for six months, and the indictment in the case had been returned nearly a year before.

Jensen asked for two categories of information—all written and recorded statements made by himself to any government agency, and any relevant documents held by government agencies. He specified the Department of Justice, the Federal Bureau

of Investigation, the Securities and Exchange Commission (SEC), and the Internal Revenue Service (IRS).

The judge denied the motion, on grounds that are unclear, but he apparently was concerned that granting it would delay the trial, and he inferred the government was not obligated to produce the information requested. The government raises several arguments in support of the judge's ruling.

First, the government contends that the Rule 16 motion was untimely and therefore it was within the trial court's power to deny. We disagree. The prior version of Rule 16 gave a time limit of ten days after arraignment for the filing of motions. Fed.R.Crim.P. 16(f), 383 U.S. 1097 (1965) (amended 1974). *See Swingle v. United States,* 389 F.2d 220 (10th Cir.), *cert. denied,* 392 U.S. 928, 88 S.Ct. 2285, 20 L.Ed.2d 1386 (1968). But the present rule, effective in 1975, omits that provision and provides, under Rule 12, only that Rule 16 motions must be made before trial unless the judge sets a different time limit. Fed. R.Crim.P. 12(b), (c). The judge, as far as the record indicates, did not set any deadline for making pretrial motions.

Second, it is argued that the government attorney had met his obligation by producing everything he intended to use at trial and everything within his possession. But the government's duty to produce is broader than this. Rule 16 requires the prosecution to produce all of defendant's written or recorded statements that are relevant and all other documents that are material. Rule 16(a)(1)(A), (C). There is some duty of inter-agency discovery, which normally can be discharged "by searching, or requesting that search be made, of the files of administrative or police investigations of the defendant, in addition to his own files." 8 MOORE'S FEDERAL PRACTICE ¶ 16.05, at 16–65 (2d ed. 1979 rev.). *Cf. United States v. Dansker,* 537 F.2d 40, 61 (3d Cir. 1976) (Jencks Act). Some courts may have gone further. *See, e. g., United States v. Bryant,* 142 U.S.App. D.C. 132, 439 F.2d 642 (D.C.Cir.1971).

We do not find it necessary to decide the extent of the government's duty to provide information held by its various agencies. We will assume the judge committed error in denying the motion. Nevertheless, errors will not require reversal of a conviction absent a showing that defendant was deprived of substantial rights. Fed.R. Crim.P. 52(a); *Wright v. United States,* 301 F.2d 412, 414 (10th Cir. 1962). We hold that failure to produce the information requested was harmless, for the following reasons.

Since the government did not offer any of Jensen's own statements into evidence to impeach him, Jensen was not prejudiced by the failure to produce such statements. Anything he wanted to put in evidence he could himself testify to at trial.

The original request under Rule 16(a)(1)(C) for other documents encompassed a broad range of information. Only three specific categories are argued on appeal, however. First, Jensen wanted documents in the government's file for the criminal prosecution against Michael Strand, who had defrauded Jensen. These would purportedly show Jensen's financial status and therefore would be material to whether he could meet the put option obligations. We are unable to imagine what information favorable to Jensen's financial status could be in the government's file that he could not produce himself.

Second, Jensen wanted information the SEC and IRS might have had on David Nemelka's financial condition at the time he owed Associated money. His purpose was to show that Nemelka was capable of paying the amount at the crucial time. We do not think this information, if indeed it existed and was favorable to Jensen, would have affected the outcome of his trial. Proving that Associated had the financial ability to exercise the put options would not preclude a conviction under section 17(a) based on material omissions about the nature of the guarantee and the fraudulent course of business because of the sham nature of the option operation.

Third, Jensen requested any SEC documents that would have shown the value of

the stocks he purchased for the accounts. He presumes that if he could have proved the stocks were valuable when he sold them to the accounts, it would have been harder to find a fraudulent course of business. But again there would still have been material omissions on the nature of the guarantees that would provide a basis for a section 17(a) violation. Further, Jensen admits there is little on which an estimation of value can be based when stock is not actively traded. There is no indication in the record that the SEC might have had information on the stocks' value that would not have been available to Jensen. We recognize that the defendants are often at a disadvantage because they cannot know with certainty what information the government has. This is a good reason for compelling liberal discovery before trial, but we will not reverse a conviction on mere speculation that favorable information exists which, if produced, might conceivably result in an acquittal on the charges.

The judgment is affirmed.