497 F.2d 280
 Fed. Sec. L. Rep. P 94,576
SECURITIES AND EXCHANGE COMMISSION, Plaintiff, Securities
Investor Protection Corporation, Applicant-Appellee,
v.
F. O. BAROFF COMPANY, INC., Defendant-Appellee.
Claim of Samuel LUBIN, Claimant-Appellant.
 No. 720, Docket 73-2665.
 United States Court of Appeals, Second Circuit.
 Argued March 11, 1974.
Decided May 29, 1974.
 
 Albert N. Proujansky, New York City (Jeffrey S. Tullman and Kane, Kessler, Proujansky, Preiss & Permutt, P.C., New York City, of counsel), for claimant-appellant.
 James B. Kobak, Jr., New York City (James W. Giddens and Hughes, Hubbard & Reed, New York City, of counsel), for defendant-appellee Trustee of F. O. Baroff Co., Inc.
 Theodore H. Focht, Gen. Counsel, Securities Investor Protection Corp., Washington, D.C. (Wilfred R. Caron, Associate Gen. Counsel, and Michael E. Don, Atty., Securities Investor Protection Corp., Washington, D.C., of counsel), for appellee Securities Investor Protection Corp.
 Before MANSFIELD and TIMBERS, Circuit Judges, and DAVIS,* Judge.
 DAVIS, Judge:
 
 
 1
 We are called upon to decide a relatively narrow point, but one of some significance, under the Securities Investor Protection Act of 1970, 15 U.S.C. 78aaa et seq. The object of that statute, and the function of the Securities Investor Protection Corporation (SIPC) it created, is to protect the public customers of securities dealers from suffering the consequences of financial instability in the brokerage industry. Securities and Exchange Commission v. Alan F. Hughes, Inc., 461 F.2d 974, 977 (2d Cir. 1972); Securities Investor Protection Corporation v. Charisma Sec's Corp., 352 F.Supp. 302, 306 (SDNY 1972). Once a broker or dealer is found to be on the brink of collapse or in danger of failing to meet its obligations to its customers, a trustee is appointed for liquidation of the business. The firmS clients are cushioned (within limits) from personal loss through a special fund collected by SIPC from all securities dealers registered under the 1934 Securities Exchange Act (much in the way that the Federal Deposit Insurance Corporation protects the depositors of banks). But the Securities Investor Protection Act allows only those who meet its definition of a 'customer' to share in this assurance. The question posed in this case is whether a voluntary lender of securities to a failing brokerage house, who made his loan to help out the company and not for a purpose related to securities trading or investments, qualifies under the ActS scheme.
 
 
 2
 The case comes before us on facts assumed to be true by the parties, the Bankruptcy Judge, and the District Court.[1] On November 30, 1971, appellant Lubin delivered 7,000 shares of the common stock of Electronic Transistor Corp. to F. O. Baroff Co., Inc., a broker-dealer. Baroff opened an account in Lubin's name and issued him a stock record receipt memorializing the delivery. Lubin also gave the broker a hypothecation letter, saying:
 
 
 3
 This is your authority to use the 6,000 shs. of Electronic Transistors Corp. in my account as collateral for F. O. Baroff Company, Inc. loans.
 
 
 4
 You understand that I may revoke this authority at any time and you will agree to deliver such securities to me, free of all loans and encumbranches, except monies which may be due to F. O. Baroff Company, Inc. upon such notice.
 
 
 5
 The record is barren of positive proff as to Lubin's motive, but in a subsequent letter to the trustee of Baroff from Lubin's attorneys, this explanation is made: 'Mr. Lubin had theretofore done a considerable amount of business with the F. O. Baroff Co., Inc. firm. He was aware that Baroff was in a cash bind and that this loan of securities was intended to help Baroff alleviate that condition. It was understood that the securities would be returned in a short period of time as soon as Baroff as able to straighten out its situation.' It is not contended that this loan of securities was made in connection with any existing or anticipated securities transactions undertaken by Lubin or on his behalf. Nor is there any suggestion of a benefit or consideration passing to him from the company. Apparently he did not have a live account with the firm at the time he made the loan.
 
 
 6
 About five weeks after this transaction, Baroff consented to an adjudication that its customers were in need of the protection of the Securities Investor Protection Act, and its liquidation commenced under a trustee's supervision.
 
 
 7
 Lubin made claim under the Act with respect to the 7,000 loaned shares, but the trustee resisted on the ground that as to those securities Lubin was not a 'customer' entitled to protection.[2] The Bankruptcy Judge agreed with the trustee's conclusion, both initially and on rehearing. Lubin sought review by the District Court but lost there as well.[3]
 
 
 8
 Appellant's contention is simply that he falls within the literal definition of a 'customer' in the 1970 statute, and is therefore entitled to its protections. The term 'customer' is spelled out at section 6(c)(2)(A)(ii) of the Act, 15 U.S.C. 78fff(c)(2)(A)(ii):
 
 
 9
 (ii) 'customers' of a debtor means persons (including persons with whom the debtor deals as principal or agent) who have claims on account of securities received, acquired, or held by the debtor from or for the account of such persons (I) for safekeeping, or (II) with a view to sale, or (III) to cover consummated sales, or (IV) pursuant to purchases, or (V) as collateral security, or (VI) by way of loans of securities by such persons to the debtor, and shall include persons who have claims against the debtor arising out of sales or conversions of such securities, and shall include any person who has deposited cash with the debtor for the purpose of purchasing securities, but shall not include any person to the extent that such person has a claim for property which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor or is subordinated to the claims of creditors of the debtor.
 
 
 10
 Lubin relies on subpart VI of this definition, 'by way of loans of securities * * * to the debtor.' In the literal sense, that is what happened here; Lubin made a loan to Baroff of his Electronic Transistor stock. The problem is whether that fact is sufficient and dispositive.
 
 
 11
 Judge Learned Hand has vividly admonished us not to be caught in the trap of language which seems, literally, too broad or too narrow to accommodate the patent legislative purposes. Guiseppi v. Walling, 144 F.2d 608, 624 (2d Cir. 1944) (concurring opinion), aff'd sub nom Gemsco, Inc. v. Walling, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945); Cabell v. Markham, 148 F.2d 737, 739-740 (2d Cir. 1945), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). Securities legislation is no exception. See, e.g. Diskin v. Lomasney & Co., 452 F.2d 871, 874 (2d Cir. 1971). This court has already heeded the caution in reading another provision of the Securities Investor Protection Act (SEC v. Alan F. Hughes, Inc., supra, 461 F.2d at 980), and the present case supplies one more apt occasion.
 
 
 12
 The legislative history is clear that the 1970 Act was not designed to protect a lender in appellant's class. Most of the definition of 'customers', including subpart VI, was taken from section 60e(1) of the Bankruptcy Act, 11 U.S.C. 96(e)(1), added in 1938, which established special rules 'where the bankrupt is a stockbroker.' Both the legislative history of that provision and its use since enactment have stressed protection to, and equality of treatment of, the public customer who has entrusted securities to a broker for some purpose connected with participation in the securities markets. See Comment, The Bankrupt Stockbroker: Section 60e of the Chandler Act, 39 Col.L.Rev. 485 (1939); Tepper v. Chichester, 285 F.2d 309, 311 (9th Cir. 1960).
 
 
 13
 The 1970 Act carries through the same theme. The House Report states: 'The primary purpose of the reported bill is to provide protection for investors if the broker-dealer with whom they are doing business encounters financial troubles.' H.Rep.No. 91-1613, 91st Cong., 2d Sess. (1970), 3 U.S. Code Congressional and Administrative News, 91st Cong., 2d Sess., p. 5255 (1970).[4] Throughout the report 'investors' is used synonymously with 'customers,' indicating that, in the eyes of Congress, the Act would protect capital markets by instilling confidence in securities traders. Earlier, at the hearings, Chairman Budge of the Securities and Exchange Commission pointed out that 'this is not to be a bailout operation; it is to protect the public customers of the firms * * *' (Hearings on H.R. 13308 (et al.) Before the the House Comm. on Interstate and Foreign the House Comm. on Interstate and Foreign Commerce, 91st Cong., 2d Sess. 369 (1970)). Speaking of possible losses of securities by customers, Philip A. Loomis, then SEC General Counsel, now a Commissioner, gave examples showing that it was the trading customer who was to be protected.[5] Similarly, a proponent of the measure on the House floor spoke of securities losses by customers of broker-dealers, obviously in the sense of trading customers. 116 Cong.Rec. 39343, 39344 (1970) (Cong. Latta).
 
 
 14
 This Congressional objective is underscored by contemporaneous events in the securities industry. The late 1960's saw the collapse of several brokerage establishments, causing serious financial losses to their clients. Self-help efforts in the industry-- such as the New York Stock Exchange Trust Fund-- were either severely strained or ineffective. There was considerable concern that investors, particularly smaller ones would lose confidence in the stability of broker-dealers, and withdraw from the securities market. The President's message endorsing the concept of insurance protection for investors in securities said that such a device 'will assure the investor that the stability of the securities industry itself does not become cause for concern' (House Hearings, supra, at 345). The emphasis throughout was on the customer as investor and trader, not on others who might become creditors of the broker-dealer for independent reasons.
 
 
 15
 This is borne out by the last portion of the definition, excluding a person whose claimed property 'by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor * * *.' There is a dispute whether this exception applies to this case; appellees say that it does while the appellant urges that the securities never became part of Baroff's 'capital'. We need not decide that question, but we note that this exclusion, even if technically inapplicable in this instance, throws light on the preceding segments of the definition. To use Chairman's Budge's words, supra, Congress was intent on protecting 'the public customers of the firms' and in avoiding 'a bailout operation' for others, including those who contributed to the capital of the broker-dealer. There is no reason to think that non-investing, non-trading creditors-- or gratuitous lenders acting through pure benevolence, family relationship, or friendship-- were to be better off under the Act than capital-contributors.
 
 
 16
 Appellant's loan of the 7,000 Electronic Transistor shares to Baroff does not meet this criterion of intent to use the lent securities (or their proceeds if hypothecated) in some type of securities trading or investment activity. On the facts before us, the loan had nothing at all to do with conventional investment, trading or participation in the securities market. There was no actual or likely use of the shares as collateral for margin purchases by Lubin of other securities; nor were the proceeds or the American Bank and Trust loan used to facilitate securities trading by Lubin. On the contrary, his professed intention was to help Baroff out of a (hopefully temporary) cash bind. Thus, there was no reasonable expectation that the shares would be sold for Lubin's account in the near future, and indeed, their immediate delivery to the American Bank and Trust Company as collateral for a pre-existing loan to Baroff put a formidable barrier in the way of any such sale or disposition. Consistently with Lubin's intention, the proceeds of the American Bank and Trust loan were used, as the Bankruptcy Judge found, by Baroff without restriction in its day-today business. These are not the indicia of the fiduciary relationship between a broker and his public customer, but rather the characteristics of, at most, an ordinary debtor-creditor relationship.
 
 
 17
 Because appellant's loan to the broker-debtor had no connection with his trading activity in the securities market, he cannot qualify by virtue thereof as a 'customer' entitled to the benefits of the Securities Investor Protection Act. He is instead in the situation of a commercial bank, trade creditor, landlord, equipment lessor, or any other party who relies on the abililty of a business enterprise to repay a business loan. If Lubin had chosen to support Baroff through a direct loan of cash, rather than taking the circuitous route of lending securities with permission to hypothecate so as to enable the broker to obtain cash, he would obviously be outside of the Act's definition of 'customers' which covers cash deposits only if they are 'for the purpose of purchasing securities.' We can think of no reason why the Congress which passed the statute would desire to protect this loan of securities by appellant but not a straightforward cash loan made by him with the very same goal.[6]
 
 
 18
 Accordingly, appellant is not entitled to the privileges of a 'customer' under the Securities Investor Protection Act of 1970; the Bankruptcy Judge and the District Court were correct in so holding
 
 
 19
 Affirmed.
 
 
 
 *
 Of the United States Court of Claims, sitting by designation
 
 
 [1]
 The trustee-appellee has reserved the right to question the accuracy of these facts if the occasion should arise
 
 
 [2]
 The Act contemplates that a person may be a 'customer' with respect to some of his claims for cash or shares, but not with respect to other. This is made explicit in the definition of 'cash customer', but it is also implicit in the general pattern of the legislation and fits with the use of the plural in the definition of 'customers' as '* * * persons * * * who have claims on account of securities received, acquired, or held by the debtor (etc.) * * *.' 15 U.S.C. 78fff(c)(2)(A)(ii)
 
 
 [3]
 Counsel for SIPC argues that the District Court, and consequently this court, lack jurisdiction to review the Bankruptcy Judge's order. It is undisputed that Lubin did not file for review within the ten-day time limit after the first adverse (and final) decision of the Bankruptcy Judge. Lubin did ask review in timely fashion after the order upon rehearing, and it is settled that a valid reconsideration by a bankruptcy referee reopens the appeal time limit. See In re Pottasch Bros., Co., 79 F.2d 613, 616 (2d Cir. 1935). SIPC attacks the rehearing as a sham designed to provide a vehicle for review, but the transcript of the hearing on reargument before the Bankruptcy Judge shows that Lubin's attorney raised a new matter (although it was unpersuasive to the Bankruptcy Judge). The Bankruptcy Judge, in ruling on the motion, expressly adverted to this matter and specifically reconsidered his prior decision in the light of it. The presentation and avaluation of this new point satisfies the minimum requirements for a bona fide rehearing, and thus provides an independent reviewable order
 
 
 [4]
 The House bill was passed in lieu of the Senate version
 
 
 [5]
 'You asked how can a customer lose, as I understand it. As I understand it, he can lose in any one of three ways. * * *
 Similarly, many customers leave their that they may sell them readily and quickly, that they may sell them readily and quickly without having to come around with a certificate. Those securities, if they are fully paid for, are supposed to be there and be segregated. But there is a possibility, if the broker gets into trouble, that they may not be.
 'Then there are customers who buy securities on margin. Their securities are necessarily left with the broker-dealer and used as collateral for the margin loan. But there may be a possibility that the customers' equity is not properly protected, that the broker-dealer borrows too much or something of that kind, or even improperly diverts the securities.' Hearings on H.R. 13308 (et al.) Before the Subcomm. on Commerce and Finance of the House Comm. on Interstate and Foreign Commerce, 91st Cong., 2d Sess. 228 (1970).
 
 
 [6]
 Appellant also raises the contention that he qualified as a 'cash customer' under section 6(c)(2)(A)(iii) of the Act. But this term is a further refinement of the 'customer' concept as defined by the Act, and out disposition of the main point disposes or this subsidiary argument as well. One cannot be a 'cash customer' unless he is a 'customer'