SECURITIES INVESTOR PROTECTION CORPORATION, Applicant-Appellant,

Securities and Exchange Commission, Plaintiff,

v.

MORGAN, KENNEDY & CO., INC., et al., Defendants-Appellees,

Claim of Reading Body Works, Inc., Profit Sharing Plan Trust, Claimant-Appellee.

No. 333, Docket 75–6066.

United States Court of Appeals, Second Circuit.

Argued Nov. 19, 1975.

Decided Jan. 23, 1976.

Wilfred R. Caron, Associate Gen. Counsel, Washington, D. C. (Securities Investor Protection Corp., Theodore H. Focht, Gen. Counsel, Michael E. Don, Sr. Atty., Washington, D. C., of counsel), for applicant-appellant.

Roberta S. Karmel, New York City (Rogers & Wells, Laurence E. Cranch, New York City, of counsel), for defendants-appellees.

Charles M. Solomon, Philadelphia, Pa. (Fox, Rothschild, O'Brien & Frankel, John C. McNamara, Jr., Philadelphia, Pa., of counsel), for claimant-appellee.

Before MOORE and TIMBERS, Circuit Judges, and COFFRIN,* District Judge.

MOORE, Circuit Judge:

In this appeal we are asked to determine whether the one hundred and eight employee-beneficiaries of a trust created under a profit-sharing plan qualify as "customers" of a bankrupt broker-dealer for the purpose of receiving compensation for losses availa-

ble to such customers under the Securities Investor Protection Act of 1970 (SIPA), 15 U.S.C. § 78aaa *et seq.*[1] The question was resolved in the beneficiaries' favor below. For the reasons which follow, we reverse and remand to the Bankruptcy Court.

## I. FACTUAL BACKGROUND

In 1957 Reading Body Works, Inc. (Reading) established a profit-sharing plan (the Plan), pursuant to which a trust fund was created and maintained through yearly employer contributions based upon Reading's net earnings. The Plan provided that employees would earn "credits" or a percentage interest in the fund according to annual compensation level and consecutive years of service. The employees' individual credit units were in proportion to the units of all employees, and were based upon the current value of the assets in the trust. Separate accounts for each employee were maintained in the records of the trust to reflect the individual employee's accumulated credits and the current value of each employee's account. Each employee's interest in the trust was vested and non-forfeitable, but payable only upon the employee's termination of employment with Reading.

Title to the trust assets was held by three trustees (the Trustees) who were responsible for the management of the trust and the investment of its assets. In 1972, an account was established with Morgan-Kennedy & Co. (the debtor). The account was held in the Trustees' names; the names of the various employee-beneficiaries did not appear on the debtor's books or records. Control over investment decisions was exercised solely by the Trustees, who communicated regularly with the debtor with respect to all transactions.

Liquidation proceedings against the debtor were commenced under SIPA in 1973, and a trustee (Bondy) was appointed. The Plan's Trustees subsequently submitted a claim for $133,501.15, the amount owed by the debtor to the trust on the filing date of the liquidation proceedings. Bondy there-

---

* Honorable Albert W. Coffrin, District Judge for the District of Vermont, sitting by designation.

1. All citations to the statute herein are to the United States Code.

after informed the Securities Investor Protection Corporation (SIPC), the corporation created under SIPA that advances funds to liquidating trustees in order to compensate for customer losses, that he intended to treat the one hundred and eight trust beneficiaries as separate customers of the debtor; this would entitle each of the one hundred and eight to SIPA's maximum insurance coverage per customer of $50,000 for securities and $20,000 for cash held by the debtor as of the date of commencement of liquidation proceedings.

Bondy's interpretation of the term "customer" was disputed by SIPC. SIPC claimed that the trust, and not each of its beneficiaries, was the debtor's customer under SIPA; accordingly, SIPC recognized only one valid insurance claim. The Trustees supported Bondy's position; they also argued alternatively that, if SIPC's position respecting the definition of customer was correct, then the three Trustees should be treated as separate customers, and each of their claims accorded the $50,000 maximum award for securities held by the debtor.

Both the Bankruptcy Court and the District Court ruled in favor of Bondy and the Trustees on the definitional issue and did not reach the alternative arguments raised by the Trustees.

## II. THE STATUTORY SETTING

SIPA was enacted by Congress in 1970 to afford protection to public customers in the event broker-dealers with whom they transact business encounter financial difficulties and are unable to satisfy their obligations to their public customers. *S. E. C. v. Alan F. Hughes, Inc.,* 461 F.2d 974, 977 (2d Cir. 1972). To this end SIPA establishes a Securities Investor Protection Corporation, commonly known by the acronym "SIPC". SIPC is a non-profit membership organization, whose members include all brokers or dealers who are members of a national securities exchange or are otherwise registered as brokers or dealers under 15 U.S.C. § 78*o* (b). Unless a broker or dealer falls within one of the exceptions (not relevant here) contained in § 78ccc(a)(2)(B), membership in SIPC is mandatory. The role of SIPC has been aptly described by one commentator:

SIPC's main function is to step in to liquidate a broker or dealer when customers' assets are in danger, and to protect a customer up to a total amount of $50,000 represented by proven claims to cash and securities expected to be in the hands of the broker or dealer. But no more than $20,000 represented by claims to cash can be recovered under the protective plan of SIPC, though the claim to securities may exceed this limit.[2]

The decision to advance monies in satisfaction of outstanding claims against a bankrupt broker-dealer turns on whether the claimant qualifies as a "customer" of the broker-dealer. The maximum award available turns on whether the customer's losses arise from cash, or from securities held by the debtor.[3] The pertinent definitional language states that

"customers" of a debtor means persons (including persons with whom the debtor deals as principal or agent) who have claims on account of securities received, acquired, or held by the debtor from or for the account of such persons (I) for safekeeping, or (II) with a view to sale, or (III) to cover consummated sales, or (IV) pursuant to purchases, or (V) as collateral security, or (VI) by way of loans of securities by such persons to the debtor, and shall include persons who have claims against the debtor arising out of sales or conversions of such securities, and shall include any person who has deposited cash with the debtor for the purposes of purchasing securities, but shall not include any person to the extent that such person has a claim for property which by

**2.** Guttman, "Broker-Dealer Bankruptcies", 48 NYULR 887, 909 (November 1973; footnotes omitted) (hereinafter cited as "Broker-Dealer Bankruptcies"). The source of the funds available to satisfy such claims is the SIPC Fund established by SIPA § 78ddd; the fund is primarily supported by assessments on members.

**3.** 15 U.S.C. § 78fff, subhead (c)(2)(A)(ii) and (f)(1)(A).

contract, agreement, or understanding, or by operation of law, is part of the capital of the *debtor or is subordinated to the* claims of creditors of the debtor . . .

15 U.S.C. § 78fff(c)(2)(A)(ii) (emphasis added).

## III. "CUSTOMER" STATUS OF THE EMPLOYEE–BENEFICIARIES

The status of trust beneficiaries is not dealt with specifically in either the above-quoted section or elsewhere in the statute. However, both the *relevant case law* and our own interpretation of the term persuade us that the trust beneficiaries before us cannot come within the term "customer", no matter how far that word is stretched in service to the equitable ends of SIPA.[4]

In *S. E. C. v. F. O. Baroff Company, Inc.,* 497 F.2d 280 (2d Cir. 1974), this Court held that a voluntary lender of securities to a failing brokerage house, who made his loan to solely help out the company, was not a customer within the meaning of SIPA. The rationale for the Court's decision was that the lender could in no wise be considered a *public investor* of the broker-dealer, the essential criterion for establishing "customer" status under the language of SIPA and within the intent of Congress.

The legislative history is clear that the 1970 Act was not designed to protect a lender in appellant's class. Most of the definition of "customers", including subpart VI, was taken from section 60e(1) of the Bankruptcy Act, 11 U.S.C. § 96(e)(1), added in 1938, which established special rules "[w]here the bankrupt is a stockbroker." Both the legislative history of that provision and its use since enactment have stressed *protection to, and equality of treatment of, the public customer who has entrusted securities to a broker for some purpose connected with participation in the securities markets.*

The 1970 Act carries through the same theme. The House Report states: "The primary purpose of the reported bill is to provide protection for *investors* (emphasis supplied) if the broker-dealer with whom they are doing business encounters financial troubles." H.Rep.No.91–1613, 91st Cong., 2d Sess. (1970), 3 U.S.Code Congressional and Administrative News, 91st Cong., 2d Sess., p. 5255 (1970). *Throughout the report "investors" is used synonymously with "customers," indicating that, in the eyes of Congress, the Act would protect capital markets by instilling confidence in securities traders.*

\* \* \* \* \* \*

*The emphasis throughout was on the customer as investor and trader* . . . 497 F.2d at 282–3 (emphasis added; footnotes and citation omitted).

Emphasis on the customer as investor and purchaser/trader has been a consistent theme in cases in this Circuit. *See, e. g., S. E. C. v. Packer, Wilbur & Co.,* 498 F.2d 978, 984 (2d Cir. 1974); *S. E. C. v. Alan F. Hughes, Inc.,* 461 F.2d 974, 977 (2d Cir. 1972); *S. E. C. v. Kelly, Andrews & Bradley, Inc.,* 385 F.Supp. 948, 950 (S.D.N.Y. 1974); *S. E. C. v. Kenneth Bove & Co., Inc.,* 378 F.Supp. 697, 700; (S.D.N.Y.1974).[5]

---

**4.** As appellants point out in their brief, br. at 24, this Court observed in *SEC v. Packer, Wilbur & Co.,* 498 F.2d 978, 983 (2d Cir. 1974) that

"Arguments based solely on the equities are not, standing alone, persuasive. If equity were the criterion, must customers and creditors of Packer Wilbur, the bankrupt, would be entitled to reimbursement for their losses. Experience, on the other hand, counsels that they will have to settle for much less. SIPA was not designed to provide full *protection to* all victims of a brokerage collapse."

**5.** *Cf. Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 95 S.Ct. 1733, 1736, 44 L.Ed.2d 263 (1975) wherein the Supreme Court, commenting on the impetus for the enactment of SIPA, implicitly acknowledged the predominance of the same attributes:

"*Following a period of great expansion in the 1960s, the securities industry experienced a business contraction that led to the failure or instability of a significant number of brokerage firms. Customers of failed firms found their cash and securities on deposit* either dissipated or tied up in lengthy bankruptcy proceedings. In addition to its disastrous effects on customer assets and investor confidence, this situation also threatened a 'domino effect' involving otherwise solvent brokers that had substantial open transactions with firms that failed. Congress enacted the SIPA to arrest this process, restore *investor confidence* in the capital markets,

**1318**

Against this background, it is impossible to classify the Reading employees as "customers" of the debtor.[6] The one hundred and eight beneficiaries were neither investors nor traders. The funds in the trust account came from Reading; the decision to entrust those funds to the debtor was the Trustees'. Appellees' counsel conceded at oral argument that none of the one hundred and eight would have had any standing as a "customer" of the then-solvent broker-dealer to give any buy or sell order in the account. The financial relationship, insofar as the Plan is concerned, was entirely between the beneficiaries and their employer, *not* the broker-dealer. Moreover, with respect to the employees' participation in the Plan, we note that it amounted only to a bookkeeping matter on the Reading books. There could be an unlimited number of employee additions to, and subtractions from, the company's Profit Sharing Plan of which the broker would have no knowledge and with which no concern. The trust account itself was in the name of the Trustees who had the exclusive power to entrust the assets to the debtor, to invest and reinvest, and to purchase and trade securities in the account as they saw fit. In short, the single trust account, represented by the Trustees collectively, possessed the required attributes for customer status under SIPA; the Reading employees possessed none of those attributes.

Not only the relevant case law, but common sense as well, mandates this result. We are hard pressed to discern *any* of the usual traits of a customer relationship between the employee-beneficiaries and the

debtor. Black's *Law Dictionary* (4th Ed., 1951) defines a "customer" as

One who regularly or repeatedly makes purchases of, or has business dealings with, a tradesman or business house. Ordinarily, one who has had repeated business dealings with another. A buyer, purchaser, or patron. (citations omitted)

The employee-beneficiaries in the case before us made no purchases, transacted no business, and had no dealings whatsoever with the broker-dealer in question respecting the trust account. Indeed, they could not have any such dealings since the broker-dealer held no property belonging to any individual employee, in which such employee could trade or invest. Calculable amounts were payable to Reading's employees only in the event that, pursuant to the terms of the Plan, they became entitled thereto. The argument that, notwithstanding their complete anonymity and total incapacity to have dealings with the broker-debtor, the Reading employees were "customers" of Morgan-Kennedy stretches that term wholly beyond its limits.

Appellees point to provisions of the Federal Deposit Insurance Act (FDIA),[7] which provide insurance coverage to the beneficiaries of customer accounts, in urging that a similar result be reached here. We cannot accept appellees' analogy of the two statutes in the case at bar. SIPA and FDIA are independent statutory schemes, enacted to serve the unique needs of the banking and securities industries, respectively. The Congress recognized this when it rejected several early versions of the SIPA bill which were patterned on FDIA and which extended insurance coverage to certain beneficial interests represented by customer accounts.[8] Moreover, insofar as SIPA's

---

and upgrade the financial responsibility requirements for registered brokers and dealers."
95 S.Ct. at 1736 (emphasis added).

**6.** The Trustees' further argument that the beneficiaries are entitled to recover as customers from SIPC since they are all "persons . . . who have claims on account of securities . . held by the debtor from or for the account of such persons . . . ." (§ 78fff(c)(2)(A)(ii)) is belied by the very fact that the claimant before this Court is the trust, not the employees. *See* n.20, *infra*. Moreover, it is incorrect

to describe the employees as possessing any claim which is presently reducible to a specific monetary sum. At most, the employees have an interest in the trust *res* which may be defeated under certain circumstances and which in any event is impossible of valuation until actual distribution is made.

**7.** 12 U.S.C. § 1811 *et seq.* The Federal Savings and Loan Insurance Act, 12 U.S.C. § 1724 *et seq.*, contains similar provisions.

**8.** *See* S. 3988, S. 3989, S. 2348 and as amended, H.R. 13308, H.R. 17585.

definition of customer is concerned, this Court has held that its roots lie in Section 60(e) of the Bankruptcy Act,[9] a view which supports our interpretation of the definition of "customer".[10]

Both of the courts below relied heavily on SIPC's Series 100 Rules (the Rules), 3 CCH Fed.Sec.L.Rep. ¶ 26,667, to support the conclusion that all of the employee-beneficiaries were customers of the debtor. This reliance was misplaced. The Rules set forth the circumstances under which accounts which are held by the same individual in different capacities shall be treated as the accounts of "separate customers";

the effect of treating the accounts in this fashion is to entitle each such account to the maximum protection available to a customer of the debtor. Only those accounts which are held by valid customers of the debtor can qualify for separate coverage.[11] Customer status under SIPA is therefore a prerequisite to the application of the Rules, and not a substitute therefor. Both of the courts below engaged in an analysis of the Rules which took no cognizance of this fact.

We note further that the specific provisions of the Rules belie rather than support appellees' position. Under Rule 104 a qualifying trust account[12] may be afforded cov-

9. 11 U.S.C. § 1 *et seq.*

10. *S.E.C. v. F. O. Baroff, supra,* at pp. 1618–1619. *See, also, S.E.C. v. Kenneth Bove & Co., Inc., supra,* at 378 F.Supp. 700, wherein the District Court commented:
> ". . . Undoubtedly, in framing the SIPA, Congress had in mind a similar concept of a protected customer, i. e., one who had entrusted his securities to the debtor and who was claiming against the debtor 'on account of securities received, acquired, or held by the debtor'. The definition in the Bankruptcy Act and SIPA sections is in identical language."

Applicability of the Bankruptcy Act to liquidations under SIPA is specifically mandated by SIPA § 78fff(c)(1):
> ". . . Except as inconsistent with the provisions of this chapter and except that in no event shall a plan of reorganization be formulated, a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under, the provisions of chapter X and such of the provisions (other than section 96(e) of Title 11) of chapters I to VII, inclusive, of the Bankruptcy Act as section 502 of Title 11 would make applicable if an order of the court had been entered directing that bankruptcy be proceeded with pursuant to the provisions of such chapters I to VII, inclusive . . . ."

Section 60(e)(1), which defines "customers of stockbrokers", is found in chapter VI of the Bankruptcy Act; accordingly, it is appropriate to look to that section for guidance here. *Cf. Exchange National Bank of Chicago v. Wyatt,* 517 F.2d 453, 458 (2d Cir. 1975). We note that, in interpreting § 60(e) courts have applied the standard adopted by this Court in *S.E.C. v. F. O. Baroff, supra. See, S.E.C. v. First Securities of Chicago,* 507 F.2d 417, 420 (7th Cir. 1974).

11. Rule 100 reads in pertinent part:
> Rule 100—General. (a) The rules set forth in this Series will be applied by SIPC in determining, for the purpose of Section

6(c)(2)(A)(iv) and Section 6(f)(1) of the Act, what accounts held with a member of SIPC (hereinafter called a "member") are to be deemed accounts of a "separate customer."
> . . .
> (c) Accounts *held by a customer* in different capacities, as specified by the rules of this Series, shall be deemed to be accounts of "separate customers." For example, an account held with a member *by a customer* in his individual capacity and another account held by him as agent for another person shall be deemed to be accounts of "separate customers." No account *of a customer* with a member shall be deemed to be held in any capacity other than his individual capacity unless (1) the records of the member disclose such other capacity and contains satisfactory documentary evidence of the relationship on which such capacity is based, or (2) the Trustee appointed under Section 5(b)(3) of the Act (hereinafter called the "Trustee") provides SIPC with evidence satisfactory to it as to the existence and effectiveness of such relationship at the filing date. (emphasis supplied)

12. Rule 104 defines a "qualifying trust account" as follows:
> (a) An account held with a member on behalf of a trust shall be deemed to be a "qualifying trust account" if the records of the member disclose the name of the testator or settlor, the trustee of the trust and the names of the current beneficiaries of the trust and:
> (i) the trust has been established by a will duly admitted to probate; or
> (ii) the trust has been expressly established by a duly executed and delivered written instrument as an *inter vivos* trust under which the settlor
> (1) may not at any time revoke the trust,
> (2) is not a current beneficiary of the trust, and
> (3) has no reversionary interest under the trust.

erage as the account of a separate customer; however, in no case may the *beneficiaries* of such a trust receive individual coverage as separate customers.[13] A similar result is reached by Rule 105 which provides that where co-owners of a qualifying joint account [14] also hold other accounts in different capacities, the joint account will be treated as belonging to a "separate customer"; maximum coverage available to a single customer only will be available to the joint account, and the co-owners will be required to divide the single award in proportion to their ownership interests in the account.[15] These provisions illustrate that,

> No account held on behalf of a "Totten" trust or any other revocable trust where, in the absence of revocation, the account will belong to a specified person on the death of the settlor shall be deemed to be a "qualifying trust account," nor shall any other account held on behalf of a trust that does not have an independent purpose be deemed to be a "qualifying trust account."

13. Rule 104 clearly states that the measure of protection is the single account, not its beneficiaries:
> (b) A qualifying trust account held with a member shall be deemed to be a "separate customer" of the member, distinct from the trustee, the testator or his estate, the settlor, or any beneficiary of the trust.
> (c) More than one qualifying trust account may be held with a member on behalf of a trust or trusts which were established by the same testator or settlor and have the same trustee, but where such accounts are held for the benefit of the same current beneficiary or beneficiaries, such accounts shall be combined so that the maximum protection afforded to such accounts in the aggregate shall be the maximum protection afforded to one "separate customer" of the member.

14. Subsection (b)(1) of Rule 105 defines qualifying joint account:
> A joint account shall be deemed to be a "qualifying joint account" if it is owned jointly, whether by the owners thereof as joint tenants with right of survivorship, as tenants by the entirety, or as tenants in common, or by husband and wife as community property, but only if each co-owner has executed a joint account agreement or similar agreement with the member and possesses authority to act with respect to the entire account.

15. The relevant provisions are found in Rule 105, § (b)(2) and (3), (c) and (d):

under SIPA, separate coverage for accounts held in different capacities is not to be confused with individual coverage for each individual owning some portion of, or interest in, the particular account. The former is explicitly provided for under the circumstances outlined in the Rules; the latter is as explicitly forbidden under the same Rules.

We find neither legislative nor judicial support for appellees' position, and we reject as inimical to our understanding of the term appellees' claim that the employee-beneficiaries of the trust account were customers of the broker-debtor.

> (2) Subject to paragraphs (c) and (d) of this rule, *each qualifying joint account with a member shall be deemed to be one "separate customer" of the member, and the protection afforded to the qualifying joint account as the account of a "separate customer" shall be made available to each co-owner in proportion to his interest in such joint account determined as provided in paragraph (a).*
> (3) Participation in a qualifying joint account shall not preclude any co-owner from being a "separate customer" by reason of an individual account with the member.
> (c) All qualifying joint accounts with a member owned by the same combination of persons shall be combined so that the *maximum protection afforded to such accounts in the aggregate shall be the protection afforded to one "separate customer" of the member,* and shall be made available to each co-owner in proportion to his respective interests in the joint accounts determined as provided in paragraph (a).
> (d) If a person participates in a qualifying joint account with a member which is not owned by the same combination of persons as own any other qualifying joint account with such member, *such joint account shall be deemed a "separate customer" of the member*; provided, however, that:
> (i) *the protection afforded to such qualifying joint account shall be made available to each co-owner in proportion to his interest in that joint account determined as provided in paragraph (a)*; and
> (ii) without thereby increasing the protection afforded to any other co-owner, *the maximum protection afforded to any co-owner by reason of his total participation in qualifying joint accounts with a member shall be that of one "separate customer" of such member.* (emphasis added)

## IV. "CUSTOMER" STATUS OF THE THREE TRUSTEES

The Trustees have argued alternatively that, if SIPC's definition of a customer is to prevail, each of the three Trustees must be considered a separate customer with separate claims against the debtor, based upon the debtor's dealings with each. This argument is without merit.

Under SIPA, the protection afforded to customers of the debtor is limited.[16] The dollar maximums for advances to customers under § 78fff(f)(1) were selected by Congress with the intent of fully protecting the small investor only.[17] Accounts in excess of $50,000—which were estimated to comprise over 90% of the total dollar value of all accounts at the time SIPA was enacted [18] —were to be left unprotected to the extent of any loss in excess of the statutory maximum.[19]

Appellees concede that SIPA was designed to give maximum coverage to the small investor rather than to the large account. Bondy's br. at 10; Trustees' br. at 12. Nevertheless, the Trustees by their argument seek to evade this legislative scheme by attempting to secure for the trust account protection in excess of the $50,000 limit established under SIPA. Any suggestion that each of the three Trustees has a separate customer claim against the debtor is untenable. The Trustees together managed the account for the trust,[20] which was the true customer of the broker-dealer;[21] the number of trustees sharing this responsibility was fortuitous.

If the available maximum of a SIPC advance depended upon the number of parties jointly holding an account, individuals could arbitrarily expand that figure at will. Such a result is obviously repugnant to the plain meaning of the statute and to the intent of Congress in passing it. Accordingly, we hold that the three trustees, by virtue of the trust account held by them collectively, may advance one customer claim only against the debtor.

## V. NATURE OF THE TRUST'S CLAIM AGAINST THE DEBTOR

The Trustees advanced a final argument before the Bankruptcy Court in the event that Judge Babitt ruled in favor of SIPC. The Trustees argued that their claim against the debtor was for securities as well as cash, thus entitling them to the $50,000 maximum advance available under SIPA for securities held by the debtor.[22] Both SIPC and Bondy disagreed, maintaining that the trust's claim was solely for a cash credit balance of $133,051.15. The parties' divergence of views arose from the fact that, following an order from the Trustees

---

16. 15 U.S.C. § 78fff(f)(1) reads in pertinent part:

Advances for customers' claims.—In order to provide for prompt payment and satisfaction of the net equities of customers of debtor, SIPC shall advance to the trustee such moneys as may be required to pay or otherwise satisfy claims in full of each customer, but not to exceed $50,000 for such customer; except that—

(A) insofar as all or any portion of the net equity of a customer is a claim for cash, as distinct from securities, the amount advanced by reason of such claim to cash shall not exceed $20,000;

(B) a customer who holds accounts with the debtor in separate capacities shall be deemed to be a different customer in each capacity . . . ..

17. *See*, Hearings on S. 2348, S. 2988, S. 2989 before the Subcommittee on Securities of the Senate Committee on Banking and Currency, 91st Cong., 2d Sess., 1 (1970).

18. *See*, "Broker-Dealer Bankruptcies" at 909.

19. *See*, Hearings on H.R. 13308, H.R. 17585, H.R. 18081, H.R. 18109, H.R. 18458 before the Subcommittee on Commerce and Finance of the House Committee on Interstate and Foreign Commerce, 91st Cong., 2d Sess., 339–340 (1970).

20. We note in passing that the claimant-appellee in this suit identified itself as "Reading Body Works, Inc. Profit Sharing Trust", Reading's br. at 1, *not* as the Trustees of that trust.

21. Reading's argument that SIPA's focus on "customers" and not "accounts" compels three recoveries for each of the Trustees therefore misses the point entirely, since the real customer was the Trust entity, and not the individuals charged with managing it.

22. 15 U.S.C. § 78fff(f)(1)(A).

to sell certain securities, the debtor delivered certain of the securities to the Chemical Bank's Clearance Department, whereupon the bank refused to release them to purchasers and instead retained them to offset the debtor's loan obligations.

It was unnecessary for the Bankruptcy Court to reach this question since, under its holding, the trust's losses would be fully compensated irrespective of whether the $50,000 or $20,000 maximum were applied. Moreover, the issue appears to have received almost no attention before the Bankruptcy Court, the judge preferring to focus his attention on the status of the employee-beneficiaries.[23]

When the parties designated the record on appeal pursuant to Fed.R.App.P. 10 and Bankruptcy Rule 806, the only submission relative to this issue was the affidavit of William Ragusin, liquidator of the debtor, and the accompanying exhibits thereto.[24] The District Court in its memorandum decision made no mention whatever of this issue. On appeal before this Court, the question received a minimum of attention by the parties. SIPC addressed itself to the nature of the trust's claim at the conclusion of its reply brief only. SIPC reply brief at 10–14. The Trustees devoted only brief space to the issue. Trustees' br. at 27–29. Bondy failed to discuss it entirely. In addition, there was some indication before the Bankruptcy Court that any determination regarding the nature of the trust's claim would require the resolution of certain factual issues.[25] Although the Trustees and SIPC presented similar versions of the transactions in question to this Court, we cannot say, in light of the Bankruptcy Court proceedings and the sparseness of the parties' discussion, that the facts surrounding those transactions have been satisfactorily developed.

The Supreme Court has cautioned against the consideration, on review, of issues not reached by the lower court and not adequately presented in the reviewing tribunal. *Dandridge v. Williams*, 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1157, 25 L.Ed.2d 491 (1970); *Aetna Casualty & Surety Co. v. Flowers*, 330 U.S. 464, 468, 67 S.Ct. 798, 800, 91 L.Ed. 1024 (1947). Where, as here, there may be a need for findings of fact before a decision can be rendered, that caution takes on an added dimension. Accordingly, we decline to rule on the nature of the trust's claim until that issue has been fully aired and decided by the court below.

Reversed and remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

---

23. See appellants appendix at p. 39a.

24. Appellee's Designation of Contents of Record, 73 Civ. 1057, March 7, 1975.

25. Ms. Karmel, counsel to the Trustees, stated to the Bankruptcy Judge that "[s]ome of the questions raised by the application of the claimant, the trustees for the Reading Body Works, do involve a determination as to certain factual issues, some of which are presently contained in the trustee's application and the cross-application of the trust, others of which I don't believe are really in dispute and could be provided in a further affidavit by the trustee or Mr. Raguson. However, it is the trustee's position that if the trustee's application is granted, these issues will all become moot. So, we would suggest that the Court not address itself to those further issues until it decides the trustee's application."

Proceedings before Judge (then Referee) Babitt, October 16, 1974, at 3–4.