SECURITIES INVESTOR PROTECTION CORPORATION, Applicant,

v.

EXECUTIVE SECURITIES CORPORATION, Defendant.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

EXECUTIVE SECURITIES CORPORATION et al., Defendants.

No. 75 Civ. 733 (CHT).

United States District Court, S. D. New York.

Nov. 29, 1976.

---

7. 45 U.S.C. § 56.

Securities Investor Protection Corp., Washington, D. C., Theodore H. Focht, Gen. Counsel, Washington, D. C., for applicant; Wilfred R. Caron, Associate Gen. Counsel, Washington, D. C., of counsel.

Leboeuf, Lamb, Leiby & Macrae, New York City, for Trustee; Grant S. Lewis, Kimba Wood Lovejoy, New York City, of counsel.

Wiggin & Dana, New Haven, Conn., for claimant-appellant Yale University; John W. Barnett, J. Drake Turrentine, New Haven, of counsel.

Willkie, Farr & Gallagher, New York City, for claimant-appellant Shearson Hayden Stone, Inc.; Thomas C. O'Keefe, New York City, of counsel.

## MEMORANDUM

TENNEY, District Judge.

This is an appeal from the order of the Honorable John J. Galgay, Bankruptcy Judge, dated February 23 and filed February 24, 1976, jurisdiction in this Court being based on Section 39c of the Bankruptcy Act, 11 U.S.C. § 67(c) and Part VIII of the Bankruptcy Rules. The issue presented is whether Shearson Hayden Stone, Inc. and Yale University (referred to collectively herein as "claimants") are "customers" of Executive Securities Corporation ("Executive") within the meaning of the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. §§ 78aaa et seq., and therefore entitled to the preferential treatment afforded to "customers" thereunder, or whether they are instead to be treated as general creditors of Executive.

The Bankruptcy Court made the following findings. Claimants, neither of whom maintained an account with Executive, were lenders of securities to Executive. In return, they received cash "collateral" equal to 100 percent of the market value of the securities on the day the securities were lent. The securities lent had not been purchased through Executive. Yale's loan was pursuant to a written agreement with Executive, called a "Security Loan Agreement"; Shearson's loan was pursuant to an oral agreement which did not vary in any material respect from the terms of Yale's agreement.

Transactions of this sort enable lenders such as claimants to increase their income by investing the cash collateral received from the broker in other income-producing investments (while at the same time the lender continues to receive payments from the broker equal to the dividends and any other distributions declared with respect to the loaned securities) (paragraph 5 of the Yale agreement). The benefit the lender hopes to derive is thus based on some later transaction concerning the cash which may not even involve the securities markets. From the point of view of a broker such as Executive, transactions of this sort enable it to obtain securities that it needs to meet various commitments, including covering short sales by its customers and fulfilling delivery commitments when its customers fail to make timely delivery of securities which they have sold.

No interest was paid under the agreements, and the loans could be terminated upon short notice by either party. Each party to the loans had the right to "mark to market"; that is, upon one day's notice, claimants could demand additional cash collateral to the extent that the loaned securities increased in value, and Executive could demand a return of the cash collateral to the extent that the loan securities decreased in value. Claimants were therefore entitled to 100 percent collateral on their loans of securities, and, as Judge Galgay recognized, any loss they ultimately suffered relates to their failure to monitor the value of the loaned securities and insist upon additional cash collateral.

Claimants had the right under their agreements to treat the loan as terminated in the event that proceedings were com-

menced by or against the borrower under, *inter alia*, SIPA (paragraph 4 of the Yale agreement). Claimants could then treat the loaned securities as having been purchased by the borrower and could retain out of the collateral an amount equal to the last sales price of the securities prior to the commencement of such proceedings (*Id.*).

Yale claims that Executive owes it $66,-700—the difference between the $200,000 collateral it retained and the $266,700 value of the securities it loaned, as computed by Yale as of February 14, 1975 when liquidation proceedings were commenced against Executive. Shearson claims $38,000 in connection with its loans.

In the order appealed from, Judge Galgay held that claimants' loans were not entitled to the protection given to "customer" claims under SIPA because the loans were not incidental to an existing investment or trading account with Executive. In so holding he relied principally on the opinion of the United States Court of Appeals for the Second Circuit in *SEC v. F. O. Baroff Co., Inc.*, 497 F.2d 280 (2d Cir. 1974), in which, after analyzing the legislative history of SIPA, the court held that a lender of stock was not entitled to "customer" protection where the loan was not made in connection with investment or trading activity with the broker. Judge Galgay explained that "[h]ere the relationship between the named parties is even clearer" since, unlike the *Baroff* claimant, claimants did not invest or trade in securities through Executive and did not even have an account with Executive. (Opinion of Judge Galgay dated Feb. 23, 1976, at 6–7.) Accordingly, he affirmed the trustee's determination that claimants were to be treated as general creditors of Executive and not as "customers" within the meaning of SIPA. *Id.* at 7–8.

Examination of the cases interpreting SIPA and its legislative history, the text of SIPA and Section 60e of the Bankruptcy Act, 11 U.S.C. § 96(e), from which it was derived, each confirms the correctness of Judge Galgay's conclusion that persons such as claimants are not "customers" of Executive within the meaning of SIPA.

The circumstances leading to creation of the Securities Investor Protection Corporation ("SIPC") by SIPA were recently described by the United States Supreme Court as follows:

"Following a period of great expansion in the 1960's, the securities industry experienced a business contraction that led to the failure or instability of a significant number of brokerage firms. Customers of failed firms found their cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings. In addition to its disastrous effects on customer assets and investor confidence, this situation also threatened a 'domino effect' involving otherwise solvent brokers that had substantial open transactions with firms that failed. Congress enacted the SIPA to arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers. S.Rep.No.91–1218, pp. 2–4 (1970); H.R.Rep.No.91–1613, pp. 2–4 (1970)." *SIPC v. Barbour*, 421 U.S. 412, 415, 95 S.Ct. 1733, 1736, 44 L.Ed.2d 263 (1975).

Specifically, SIPA was enacted to provide special protection for "customers" of a failed broker-dealer by allowing them to receive preference over general creditors and allowing their claims to be satisfied to a limited extent by funds advanced by SIPC, if assets in the "single and separate fund" were insufficient.

The definition of the word "customers" upon which the determination herein was based is found in Section 6(c)(2)(A)(ii) of SIPA, 15 U.S.C. § 78fff(c)(2)(A)(ii). It defines "customers" as follows:

"persons (including persons with whom the debtor deals as principal or agent) who have claims on account of securities *received, acquired, or held by the debtor from or for the account of such persons* (I) for safekeeping, or (II) with a view to sale, or (III) to cover consummated sales, or (IV) pursuant to purchases, or (V) as

collateral security, or (VI) *by way of loans of securities by such persons to the debtor*, and shall include persons who have claims against the debtor arising out of sales or conversions of such securities, and shall include any person who has deposited cash with the debtor for the purpose of purchasing securities, but shall not include any person to the extent that such person has a claim for property which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor or is subordinated to the claims of creditors of the debtor." (Emphasis supplied).

The application of this definition to securities lenders was recently addressed by the United States Court of Appeals for the Second Circuit in an opinion relied on by Judge Galgay, as hereinbefore noted, which opinion considered the circumstances under which persons who lend securities to a broker-dealer are "customers" of the broker-dealer within the meaning of SIPA. *SEC v. F. P. Baroff Co., Inc., supra*, 497 F.2d 280. The claimant in *Baroff*, Mr. Lubin, loaned 7,000 shares of the common stock of Electronic Transistor Corp. to the broker-dealer. The broker-dealer opened an account in Mr. Lubin's name in which the transaction was reflected and issued a receipt to him memorializing delivery. Mr. Lubin authorized the broker-dealer to use the securities as collateral for the broker-dealer's own loans and did not give the securities to the broker-dealer in connection with his own participation in the securities markets. About five weeks after the transaction, proceed-

ings were commenced for the liquidation of the broker-dealer under SIPA. Mr. Lubin argued that since he had made a loan of securities (which had been reflected in his account), he came within the language of SIPA and was entitled to its protection. Although the court recognized that "[i]n the literal sense, that is what happened," that fact was not deemed sufficient or dispositive. *Id.* at 282.

The court analyzed the legislative history of SIPA and concluded that only loans made by a customer in connection with trading through the broker being liquidated were meant to be protected as "customer" loans to that broker under that Act. *Id.* at 282–83. It noted that the House Report on the bill stated the bill's main purpose as protection of persons who deal in securities through a broker when that broker faces financial difficulties, and pointed out that the testimony on the bill corroborated the conclusion that it was the *trading customer* who was to be protected by SIPA. *Id.* at 283. The court further observed that "[t]here was no actual or likely use of the shares as collateral for margin purchases by Lubin of other securities. . . . [T]here was no reasonable expectation that the shares would be sold for Lubin's account in the near future." *Id.* at 284. The court then concluded that Mr. Lubin's loan did not have "the indicia of the fiduciary relationship between a broker and his public customer, but rather [had] the characteristics of, at most, an ordinary debtor-creditor relationship." *Id.*[1] Accordingly, the court held that

---

1. The meaning of "customer" as used in SIPA was recently addressed by the Court of Appeals for the Second Circuit in *SIPC v. Morgan, Kennedy & Co., Inc.*, 533 F.2d 1314 (2d Cir. 1976). There the court reviewed its decision in *Baroff* and, noting that "[e]mphasis on the customer as investor and purchaser/trader has been a consistent theme in cases in this Circuit," *id.* at 1317, held that in spite of the fact that the Reading Body Works, Inc. Trust was a customer of Morgan, Kennedy & Co., Inc., the individual beneficiaries of the Trust were not customers of Morgan, Kennedy (and thus were not each entitled to the maximum reimbursement from the SIPC Fund). Although the *Morgan, Kennedy* opinion does not bear directly on

the status of a stock *lender*, it reaffirms the meaning of "customer" as one who trades or invests in securities through the failed broker-dealer.

In another bankruptcy proceeding, *SEC v. Howard Lawrence & Co., Inc.*, 74 Civ. 193 (S.D. N.Y. Feb. 14, 1975), Judge Galgay considered the claim of Mr. Ralph Smith, who had loaned securities to a failed broker-dealer in order to enable it to meet a commitment to another customer. Mr. Smith maintained an active trading account with the broker-dealer. The court recognized the applicability of the principles enunciated in the *Baroff* decision and affirmed the Trustee's rejection of the claim: "We have discarded the literal interpretation of

"Because [Mr. Lubin's] loan to the broker-debtor had no connection with his trading activity in the securities market, he cannot qualify by virtue thereof as a 'customer' entitled to the benefits of the Securities Investor Protection Act." *Id.*

Claimant Yale's brief advances two grounds for distinguishing the *Baroff* case. First, it argues that claimants' loans were related to their investment in the securities market because they received collateral in return for their loans, whereas the lender in *Baroff* did not receive consideration for his loan. (Yale's Brief at 36–37.) But the *mere receipt of money in return for the use* of securities does not provide the requisite connection between the loan of securities and trading activity. Claimants purchased securities elsewhere before loaning them to Executive; their claims fail, *not* because they are not *investors* in the securities market, but because their securities were not lent in connection with trading or investment through Executive.

Claimant Yale's second ground for distinguishing the *Baroff* case is that because the lender in *Baroff* did not receive consideration for the loan, he made a contribution to capital, a transaction which is specifically excluded from SIPA's definition of "customer." *Id.* at 35. The court in *Baroff*, however, considered that argument and refused to base its holdings upon it. *Baroff, supra*, 497 F.2d at 284. Thus, this distinction is without merit.

Claimants further suggest that their transactions fall squarely within the transactions listed in Section 6(c)(2)(A)(ii) of SIPA, 15 U.S.C. § 78fff(c)(2)(A)(ii), claiming that such provisions must be read literally. The Second Circuit rejected any such literal reading in *Baroff*. Indeed, even were SIPA

read literally, a "customer" is clearly limited to persons who maintain accounts with broker-dealers and who trade or invest through them.[2] Claimants had no account with Executive and clearly do not come within SIPA's definition of the word "customer." Nor would claimants have been protected by opening a nominal trading account, unless the loan was in connection with that account. As indicated above, the claimant in *Baroff* did have an account with the debtor, although it was not a "live" account at the time of the loan. However, what claimants might have done has no bearing on the issue; they did not in fact have accounts with Executive.

Finally, claimant Yale makes reference to the legislative history of Section 60e of the Bankruptcy Act, 11 U.S.C. § 96(e), since SIPA's definition of "customer" was taken virtually verbatim from the definition contained in Section 60e. However, there is nothing in the legislative or legal history of Section 60e that suggests that it was intended to do more than eliminate the inequities among cash and margin customers arising from conflicting treatment in different jurisdictions and to provide protection to such customers who made loans of securities to brokers in connection with their participation in the securities markets and out of their trading accounts. There is nothing to suggest that Congress was concerned with broadening the protection that parties to secured loan agreements, such as those involved herein, would receive. Nor are there persuasive policy reasons to give special protection to securities lenders such as claimants. Indeed, they already enjoy greater protection than normal secured creditors, not only because their collateral is fully liquid cash, but also because of their

the word 'customers' to conform to the general policy of the Act. Mr. Smith, in order to be protected, must have made the loan pursuant to his position as an investor in securities." *Id.* Other decisions dealing with different aspects of SIPA have also recognized that the act was intended to protect customers who *traded* through the failing broker. *SEC v. Packer, Wilbur & Co., Inc.*, 498 F.2d 978 (2d Cir. 1974); *SEC v. Aberdeen Securities Co., Inc.*, 480 F.2d

1121 (3d Cir.), cert. denied, 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973).

2. Section 6(c)(2)(A)(ii) states in pertinent part:
   "(ii) 'customers' of a debtor means persons . . . who have claims on account of securities received, acquired, or held by the debtor *from or for the account* of such persons . . . (VI) by way of loans of securities by such persons to the debtor . . ."
   (Emphasis supplied).

right to demand additional cash collateral in the case of market increases.

The determination of the Bankruptcy Court is affirmed.

So ordered.