**SECURITIES INVESTOR PROTECTION CORPORATION, Plaintiff,**

v.

**The I.E.S. MANAGEMENT GROUP, INC., Defendant.**

**Civ. A. No. 77–1039.**

United States District Court, D. New Jersey.

July 12, 1985.

David J. Sheehan, and Ira J. Hammer, Crummy, DelDeo, Dolan, Griffinger & Vecchione, P.C., Newark, N.J., for trustee for the Liquidation of The I.E.S. Management Group, Inc.

Arthur J. Delaney, Chd., John W. Karr, Karr, Lyons & Burns, Washington, D.C., for Stoneybrook Apartments and Townhouses, Ltd., and its partners.

## OPINION

HAROLD A. ACKERMAN, District Judge.

In this complex and prolonged liquidation proceeding of Investors Economic Systems (IES) Management Group, Inc., (Management Group), Michael R. Griffinger is the appointed Trustee. Management Group, a Delaware Corporation wholly owned by IES which itself has sought relief under Chapter XI of the Bankruptcy Act, was a registered broker-dealer with the Securities and Exchange Commission. As such, it provided financial services to some 1,600 customers who, upon liquidation, filed claims with the Trustee. Pursuant to court order and to his obligations under the Securities Investor Protection Act of 1970 (SIPA), 15 U.S.C. § 78aaa, *et seq.* (1976), the Trustee has engaged in rendering his determinations on these claims. Pursuant to this Court's Order dated November 18, 1977, certain claimants (limited partners in a real estate syndication known as Stoneybrook Apartments and Townhouses, Ltd.) having received an adverse determination from the Trustee, filed objections with this Court. The matter is presently before me on cross-motions for summary judgment, in essence seeking affirmance or reversal of the Trustee's determination. The Stoneybrook claimants and the Trustee agree that there are no genuine issues of material fact in this regard precluding summary judgment. *See* Rule 56 of the *Federal Rules of Civil Procedure; Sames v. Gable,* 732 F.2d 49, 51 (3d Cir.1984). I agree and for the reasons which follow I have decided to affirm the Trustee's denial of the claims filed by the Stoneybrook limited partners and thus to grant judgment in favor of the Trustee with respect to the instant claims.

The undisputed facts pertinent to the pending motions are as follows. The Stoneybrook claimants are 26 investors who together paid $466,000 in cash for ten Class "A" shares in the Stoneybrook limited partnership. The investment was made in reliance on the offering memorandum Exhibit A to claimants' Statement of Facts Not In Dispute (hereinafter "PPM" or Private Placement Memorandum). The memorandum authorized payment by the limited partners in two phases. On or about December 13, 1976 payments totalling $366,000 were made. Subscription Agreements were entered into at this time and this was the date the Certificate of Limited Partnership was filed with the Essex County Clerk. *See* Exhibit C to Affidavit of Patricia Jacobs. On January 15, 1977 a final payment totalling $100,000 was made. The PPM authorized the use of the proceeds of these payments for the purchase of partnership property, in particular a 113 unit garden apartment complex in Houston, Texas, then owned by a Mr. Joseph Durst. The property was encumbered by a $2,000 mortgage and consisted of leased rental units. Revenue from the leases was to cover management expenses and distributions to the limited partners. The PPM further stated that "[i]t is understood and represented that the Partnership shall not become effective until such time as the said improvements are conveyed to the Partnership." PPM.

The PPM identified Westwood, Inc. as the general partner for the limited partnership in question. Westwood is a wholly owned subsidiary of IES, as is Management Group, and was organized in 1973 to act as the corporate general partner for numerous real estate limited partnership syndications which were developed, packaged and sold by IES through Management Group. It is undisputed that "the officers and directors of IES and its subsidiaries were virtually identical. The parent, IES, conducted no business of its own but merely acted as a conduit, bill payer and guarantor of its subsidiaries' debts and helped to administer the operations of the IES group of companies. Substantially all the business conducted by the IES group was conducted by subsidiary corporations. The same management personnel for the various subsidiary companies handled all phases of the transactions, including putting the various transactions together, maintaining the books and records, controlling the flow of funds, managing the properties and partnerships and generally superintending all transactions from start to finish." Trustee's Objection to Allowance of Claim and Counter Claim, filed January 12, 1979 at 4, quoted in Claimants' Reply Brief to Trustee's Opposition to Cross-Motion at 8; *see generally, id.* at Exhibits I and J.

The PPM further set forth the general partner's fiduciary responsibilities, its relationship to Management Group, its general responsibilities and the requirements for removal of Westwood as general partner. The PPM also stated that:

    ... although the General Partner has undertaken certain obligations to the Partnership, the fulfillment of these obligations is dependent upon the General Partner's financial strength....

Affidavit of Patricia Jacobs, Exhibit B at 26.

It is undisputed that the partnership was organized with the purpose of acquiring and operating the Stoneybrook properties described *supra.* The PPM thus further provided that "Westwood, Inc. will purchase from Joseph Durst the property and garden apartment complex constructed thereon which is the subject matter of this private placement. Subsequent to its purchase, Westwood, Inc. shall convey the property to the partnership at which time the partnership shall take title in the name of the partnership." Exhibit B to Affidavit of Patricia Jacobs at 19.

Pursuant to his responsibilities in this regard, on August 4, 1976, Joseph Durst contracted to sell the properties in question to "a limited partnership to be formed of which Westwood, Inc. will be the general partner." *See* Exhibit E to Claimants' Reply to Trustees' Opposition (Letter to Terry Madden, President of IES dated August 4, 1976, signed by Joseph Durst). This Agreement was further "agreed and accepted" by signature of Terry Madden, President of Westwood, Inc. The Agreement to sell provided for a purchase price of $2,370,000 to be paid as follows:

    A. By Purchaser taking subject to a "Wrap-Around" Note and Deed of Trust in the amount of $2,000,000, payable as follows:

        It shall bear interest at the rate of 9%: Be for a term of 32 years bearing constant annual payments (payable monthly) in the amount of $191,000.

    B. By the payment of cash at the closing in the amount of $250,000.

    C. By the payment of $80,000 on February 15, 1977 and by an additional payment of $40,000 on February 15, 1978.

*Id.* In partial fulfillment of the purchase price as described in this Agreement, an unsecured promissory note in the amount of $120,000 was executed on December 1, 1976. The note provided for the payment by Westwood to Durst of $80,000 on February 15, 1977 and $40,000.00 on February 15, 1978. *See Id.* at Exhibit B. The execution of this note was not specifically authorized by the PPM and was never disclosed to the limited partners herein. Further, on December 1, Joseph Durst, pursuant to the Agreement of Sale described above, conveyed the Stoneybrook properties to John J. Szerszen, Vice President of Westwood. *See id.* at Exhibit K. Thereafter, also on

December 1, Mr. Szerszen on behalf of Westwood, Inc. conveyed these properties to the Stoneybrook limited partnership.

As noted *supra*, on December 13 the claimants herein made their first payment and the Certificate of Partnership was filed. On December 31, if not before, pursuant to the owners' policy of title insurance, of that date, the partnership officially acquired title to the subject property. Exhibit D to Affidavit of Patricia Jacobs. It is undisputed that the partnership commenced upon acquiring title to the property in question.

On January 15, 1977, the limited partners made their final payment of $100,000 to Westwood. (I note that there appears to be an issue of fact regarding the precise amount of this payment, however, I do not find the amount of this payment to be material to resolution of the instant motion.) On February 15, 1977, upon the maturation of the obligation incurred by Westwood to Durst for payment of $80,000 pursuant to the promissory note cited *supra*, Westwood apparently defaulted notwithstanding its obligation pursuant to the Certificate of Partnership to apply $75,475 of the $100,000 January 15, 1977 payment to satisfaction of the balance due on the total cash purchase price for the properties in question. *See* Exhibit C to Affidavit of Patricia Jacobs at 7. It is undisputed that Mr. Durst thereupon foreclosed upon the partnership property and sold it to an alleged *bona fide* purchaser for value. The property was subsequently resold. *See* Claimants' Statement of Facts at ¶ 10.

The limited partnership filed a Chapter XI petition in the Bankruptcy Court in the Southern District of Texas. Ten other limited partnerships also syndicated by Management Group and involving Mr. Durst filed bankruptcy petitions at about the same time. A new general partner was substituted for Westwood and a settlement agreement was entered by Durst, Greenway Management Corporation (a Durst company), Stoneybrook and the ten other similarly situated limited partnerships on September 26, 1978. Pursuant to this and subsequent agreements, the Stoneybrook partners recovered $350,000 which had been paid to Durst by Westwood and had the mortgages against the partnership property reinstated. The parties to the settlement agreement agreed to resolve all differences between them thereby.

In pursuing their claim before the Trustee and in support of their cross-motion herein, the Stoneybrook claimants make the following arguments. First, they argue that any settlement with Mr. Durst in no way settled claims regarding monies allegedly misappropriated by the broker-dealer. *See* Request to Admit # 32, Exhibit 1 to Affidavit of Patricia Jacobs. Second, they contend that the co-mingling of funds, management and operations between IES, Management Group and Westwood make it impossible to denominate Westwood as general partner and IES or Management Group as broker-dealer at least as far as the Stoneybrook transaction was concerned. In essence, they contend that Westwood and IES or Management Group were one or, at least, that Westwood operated as a broker-dealer. *See, e.g., id.* at Request to Admit # 1. Finally, they contend that they received the bargained for limited partnership interests only "to the extent that the broker dealer delivered the full security interest and paid the previous owner for the security interest. [However,] to the extent that such monies paid to the broker dealer were not used to pay the previous owner, then a full limited partnership interest was not received." *Id.* at Request to Admit # 15. In short, the Stoneybrook limited partners claim that Westwood/IES Management Group misappropriated funds to be paid to Mr. Durst thereby causing default and that they therefore never received the limited partnership interest paid for from the broker-dealer. Pursuant to the provisions of SIPA described *infra*, these claimants seek to recover these monies from the bankrupt broker-dealer: the IES Management Group.

In denying the claim of the Stoneybrook limited partners and in support of its mo-

tion for summary judgment herein, the Trustee contends that the investors obtained the limited partnership interest in question from the broker-dealer and consequently that regardless of any claim these investors may have against Westwood, the general partner, they have no claim against IES Management Group, the broker-dealer, as "customers" under SIPA. In the alternative, the Trustee contends that the settlement agreement with Durst operated as a waiver of any claims against the broker-dealer or a bar of such claims through abrogation of the Trustee's right of subrogation.

I turn now to a review of the pertinent provisions of SIPA. I note that though SIPA was amended in 1978, 1980 and again in 1982, all parties agree that the 1970 version of the Act, in effect at the time of the underlying events herein in 1976 and 1977, governs the instant case. A proceeding under SIPA is in essence a bankruptcy or liquidation proceeding conducted in accordance with Chapter X of the Bankruptcy Act. *See* SIPA, Sec. 6(c)(1) (I note that I will refer to the section numbers of the Act as the parties have done instead of to the sections of the Act as codified in the United States Code); *see also Exchange National Bank of Chicago v. Wyatt*, 517 F.2d 453 (2d Cir.1975); *SEC v. Aberdeen Securities Co.*, 480 F.2d 1121, 1128 (3d Cir.), *cert. denied*, 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973). SIPA establishes procedures for liquidation of financially troubled broker-dealers and "seeks to provide assistance to those investors unfortunate enough to have selected a stockbroker, who perhaps is able to give sound financial advice to others but is unable to stay solvent himself. The intent of Congress to protect customers of financially distressed security dealers is clear, but the specifics of precise resolution of individual situations are clouded by the provisions of a statute which range far from the clarity of blue sky one might expect in this area of law." *Id.* at 1123. In *Aberdeen*, the Third Circuit summarized the SIPA scheme in the 1970 Act as follows:

The Securities Investor Protection Act was passed by Congress in 1970 in response to demands that it provide some assurance to investors that they would not suffer financial loss as a consequence of bankruptcy of their stockbrokers. While the theory of the statute was that it was to provide a type of protection for security purchasers somewhat similar to that enjoyed by bank depositors under the FDIC, the complexities of the securities market obviously required some major differentiations.

In broad outline the legislation contemplates the appointment of a Receiver in the event of the insolvency of a broker who is covered by the terms of the statute. A liquidation, rather than a reorganization, is to be conducted and the claims of the debtor's customers are to be paid promptly. To the extent that the insolvent broker's assets are insufficient to satisfy obligations to his clientele, the Securities Investor Protection Corporation (SIPC), an entity established by the Act, will advance funds to pay claims up to $50,000 per customer, of which no more than $20,000 represents reimbursement of cash.

The account of a customer is to be valued as of the day when proceedings are instituted against the broker—the "filing date"—in order to determine his "net equity". A computation is made to arrive at the dollar amount of the customer's account by excluding from it, specifically identifiable property which is returned to him; by deducting indebtedness and other obligations, if any, to the insolvent broker; and by giving effect to certain open contractual commitments.

All property held by the debtor for the account of his patrons, other than that specifically identifiable, forms a single and separate fund in which all customers are entitled to share pro rata.

The Trustee may satisfy customer claims from the single and separate fund or from the monies advanced by SIPC or by a combination from the two sources. To the extent that a claim is satisfied by advances from SIPC, it is subrogated to

the customer's rights to a pro rata share of the single and separate fund.

*Id.* at 1123–24; *see generally,* SIPA § 6(c). Thus, those who fit the definition of "customer" under Section 6(c)(2)(A)(ii) are accorded preferential treatment in the satisfaction of claims in the form of a priority over general creditors. *See* Report of Special Study of Securities Markets of the SEC, H.R.Doc. No. 95 Pt. 1, 88th Cong., 1st Sess. 411–12 (1963); *SEC v. Kenneth Bove & Co.,* 378 F.Supp. 697, 700 (S.D.N.Y.1974).

A "customer" for purposes of liquidation proceedings under SIPA is defined as follows:

> "[C]ustomers" of a debtor means persons (including persons with whom the debtor deals as principal or agent) who have claims on account of securities received, acquired, or held by the debtor from or for the account of such persons (I) for safekeeping, or (II) with a view to sale, or (III) to cover consummated sales, or (IV) pursuant to purchases, or (V) as collateral security, or (VI) by way of loans of securities by such persons to the debtor, and shall include persons who have claims against the debtor arising out of sales or conversions of such securities, and shall include any person who has deposited cash with the debtor for the purpose of purchasing securities, but shall not include any person to the extent that such person has a claim for property which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor or is subordinated to the claims of creditors of the debtor; ...

SIPA, § 6(c)(2)(A)(ii). The Trustee disallowed the claims of the Stoneybrook limited partners finding them not to be "customers" within the meaning of SIPA. All parties agree that the central issue before this Court today is whether the Stoneybrook claimants are "customers" as a matter of law. As I read the operative subsection quoted *supra,* an investor can be a customer in one of two situations:

1. where they state claims on account of securities received, acquired, or held by the debtor for one of the four purposes specified in the Act including where claims arise from alleged sales or conversions of such securities or

2. where the claims are by any person who has deposited cash with the debtor for the purpose of purchasing securities.

▮▮▮▮ In determining whether an investor is a customer under SIPA regarding a particular transaction with a debtor in liquidation under SIPA, a court must keep in mind the general purposes and confines of the investor protective measures enacted therein. The Fifth Circuit, referring to the amended version of the statute, has recently explained that:

> "Customer," ... is a statutorily defined term of art as used in SIPA. The term is an integral part of a comprehensive statutory scheme governing the rights of creditors and brokers. It is not used in the colloquial sense of "one who buys or trades". It is instead meant as a shorthand designation for those eligible under SIPA to receive special protection for their investments.

*In Re Stalvey and Associates, Inc.,* 750 F.2d 464, 468 (5th Cir.1985). In amending the Act Congress noted that:

> The definition of "customer" should include only a person who enjoys the type of fiduciary relationship with the debtor that characterizes customers in general. Recent decisional law is codified in the definition to provide that only securities received "in the ordinary course of [the debtor's] business as a broker or dealer" may form the basis of a customer claim. *See, e.g., SIPC v. Executive Securities Corp.,* 556 F.2d 98 (2d Cir.1977); *SEC v. F.O. Baroff Co.,* 497 F.2d 280 (2d Cir.1974).

Hearing before the Subcommittee on Securities, Senate Committee on Banking, Housing & Urban Affairs, 95th Congress, Second Session, at 40 (April 25, 1978). As noted in the section quoted, this view was shared by the courts before the statute was amended. *See, id.* (and cases cited therein). Thus, it is clear that "the Act contemplates that a person may be a 'customer'

with respect to some of his claims for cash or shares, but not with respect to others." *Baroff,* 497 F.2d at 282, n. 2; *see Stalvey,* 750 F.2d at 471. Similarly, where the debtor in liquidation acts as a broker-dealer with respect to certain transactions and acts in some other capacity with respect to others, it is clear that the investor is only a "customer" under SIPA with respect to those transactions in which the debtor acted as a broker-dealer. *See SEC v. Ambassador Church Finance/Development Group Corp.,* 679 F.2d 608, 612–14 (6th Cir.1982). Further, "the intent of Congress in enacting SIPA, as shown by the legislative history ... was ... to protect investors against losses caused by the insolvency of broker-dealers and not by the insolvency of the companies in which their funds have been invested." *SEC v. Wagner,* 373 F.Supp. 1214, 1218 (D.Mass.1974). Finally, the Fifth Circuit has noted that:

> ... there is evidence in the legislative history that Congress believed that the SIPA was only an "interim step" that would not provide complete protection for losses occasioned by the failure of broker-dealer firms.... Courts have acknowledged the limited coverage of the SIPA regardless of the equities in favor of the claimant. (Citations omitted).

*Stalvey,* 750 F.2d at 472–73.

■ In this case, I agree with the Trustee that at least as of December 31, 1976, when the title to the Stoneybrook properties was officially held by the limited partnership, the claimants herein can be said to have received their limited partnership interests and thus the broker-dealer did not receive, acquire or hold securities owned by these partners at the time of the alleged misappropriation of funds. In short, the claimants admit that a Certificate of Partnership was filed, that title to the property was acquired by the partnership, and that the partnership was fully formed upon that acquisition. Thus, at the time title was acquired they received the limited partnership. Although the claimants attempt to construe their claim differently, in reality their gripe is with the general partner, or IES Management Group no longer acting

as broker-dealer but as general partner in the form of Westwood. That the general partner failed to meet a payment to the seller of the partnership property states a claim of mismanagement against the general partner not a preferred status customer claim under SIPA. The investors' claim arises out of the failure of the general partner to apply their January 1977 payment to the February 1977 installment due to Durst. At the time they made their January 1977 payment the partnership was already in effect and the limited partners had already received their security interest. Because they had received the security interest bought from the broker-dealer the dealer did not have it. *See, e.g., Matter of Atkeison v. Ambassador Church,* 446 F.Supp. 844, 848 (M.D.Tenn.1977).

It is true that the general partner, or, if you will, the broker-dealer, had the $100,000 cash payment. But it is absolutely clear that by January 1977 this cash was not held for the purpose of purchasing a security interest in a limited partnership. This had already occurred. In January 1977, the cash paid was for payment for the services of the general partner and for purchase of partnership property and not for the purchase of a security interest covered by SIPA.

Because I conclude, as did the Trustee, that with respect to the transaction at issue the Stoneybrook claimants were not "customers". I affirm the Trustee's denial of their claim for participation in the fund pursuant to SIPA and I need not address the Trustee's contention that the Stoneybrook claimants had waived their claims through their settlement with Durst at this time. The Trustee's motion is granted and the claimants' cross-motion is denied.